Docket No. 90914–Agenda 13– September 2001.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. JESUS VILLARREAL, Appellee.

Opinion filed December 6, 2001.

JUSTICE FREEMAN delivered the opinion of the court:

In the circuit court of Rock Island County, a jury found defendant, Jesus Villarreal, guilty of second degree murder in connection with the death of Ali McDonald. He appealed, claiming that he had not been proven guilty of second degree murder beyond a reasonable doubt. He argued in the alternative that he had been denied a fair trial by the verdict forms submitted to the jury and/or by improper admission of gang evidence. The appellate court found that the verdict forms used in this case had denied defendant a fair trial, and reversed his conviction and remanded for a new trial. No. 3–99–0048 (unpublished order under Supreme Court Rule 23). We granted the State leave to appeal to this court. See 155 Ill. 2d R. 315(a). We now reverse the judgment of the appellate court and reinstate defendant’s conviction.

BACKGROUND

In the early morning hours of June 26, 1998, Moline Police Officer Robert McNabb responded to a call in the neighborhood of 4528 7th Avenue in Rock Island, Illinois. He found Ali McDonald lying in the street, bleeding from two stab wounds. An ambulance was summoned, but the victim died before it arrived. Defendant was arrested later that morning and gave a statement to police.

On June 27, the day after his arrest, defendant was charged by information with first degree murder, in that he had caused the death of the victim while committing the felony of aggravated battery (felony murder) (720 ILCS 5/9–1(a)(3) (West 1996)). Shortly thereafter, defendant filed notice of his intention to assert the defense of justifiable use of force. Jury trial was set for October 13. On October 8, the State filed two additional charges against defendant. He was charged with first degree murder in that he had caused the death of the victim in that he stabbed the victim, knowing that his act created a strong probability of death to the victim (first degree strong probability murder) (720 ILCS 5/9–1(a)(2) (West 1996)), and with second degree murder, in that he had committed first degree strong probability murder and at the time of the killing he unreasonably believed the circumstances to be such as would justify or exonerate the killing (720 ILCS 5/9–2(a)(2) (West 1996)).

Defendant filed a pretrial motion 
in limine
 to bar the State from introducing evidence of gang affiliation. The court denied the motion after conducting a pretrial hearing on the issue. The following evidence was adduced at the pretrial hearing on the motion and at trial.

At the pretrial hearing, Officer McNabb testified that shortly before 4 a.m. on June 26, 1998, he was in a public alley behind 156 4th Avenue in Moline. A number of persons were “hanging around” in the alley, having a casual boxing match. Officer McNabb knew that most of the individuals present were members of the Bishops street gang. However, he stated that he did not know defendant and defendant was not in the group. He stated that the 100 block between 4th and 5th Avenues in Moline was “Bishop territory.”

After Officer McNabb had been in the alley for approximately 15 minutes, he observed four persons walking westbound past the front of the house on 4th Avenue. The officer later learned that the four persons were Onis Garcez, Hector Valles, Omar Garcia, and the victim, Ali McDonald. Soon after McNabb noticed the four men, the Bishops walked towards the front of the house to confront them. McNabb drove his squad car around to the front of the house to intervene. As the Bishops came around to the front of the house, they were yelling, challenging the passers-by. McNabb heard yells of “Bishops” and “punk and wetback and things like that.”

When McNabb arrived at the front of the house, he ordered the Bishops to return to the rear of the house, then patted down the four pedestrians against his squad car for weapons and identification. McNabb then began to escort the four men out of the area, to the border of Moline. Before they crossed the border, however, McNabb received a dispatch to respond to an automobile accident. He left, but was immediately called back to the scene. When he arrived, he saw the victim lying wounded on the ground.

McNabb testified that he had been in contact with the Bishops for more than a year and a half. He stated that the Bishops were challenging the other four men because Bishops routinely challenged any group of non-Bishop Hispanic males in their area.

McNabb testified that the non-Bishops were not making any gang-related comments. He did, however, admit that they were yelling back at the Bishops in Spanish, a language McNabb does not understand. He stated that although the four men initially just wanted to leave, they seemed to want to “go at it” after all of the comments had been exchanged between the two groups. The victim initially refused to comply with the officer’s attempt to search him; the officer had to open his baton before the victim complied. The victim continued to exchange comments with one of the Bishops in the officer’s presence, even after all of the other Bishops had returned to the rear of the house.

At trial Officer McNabb repeated the above testimony, adding that he did find a bat at the scene of the stabbing, but no other weapons.

Enrique McDonald, the brother of the victim, lived one or two blocks from the site of the initial encounter. He testified at the pretrial hearing that he was home the night of the murder, and the victim was at his house, as were several other people. At about 2 or 2:30 a.m., they heard yelling outside, and McDonald saw six young men, one of whom was defendant, out in the street. McDonald did not hear defendant yell anything, but the group was yelling the phrases “[w]hat’s going on–what’s up. What’s rolling?” He also heard the word Bishops, but did not know who said it. The victim ran at the men because one of them threw a bottle. McDonald grabbed a baseball bat and followed his brother.

At trial McDonald added more detail about events he observed. McDonald testified that he shouted at the victim that defendant had a knife, but the victim paid no attention to him. After defendant and the victim had run around a corner, defendant stopped and stood “waiting for” the victim. The victim closed with defendant, and threw a punch. Defendant lunged at the victim with the knife, and the victim fell. McDonald chased defendant, and hit him with the baseball bat when he stumbled, near a telephone in the street. McDonald testified that the victim never had a baseball bat or any weapon. McDonald returned to the victim after hitting defendant, because other men were hitting the victim with a baseball bat as he lay in the street.

On cross-examination, McDonald admitted that when he gave a statement to the police shortly after the stabbing he told them that the victim was not the first person to move towards the men in the street; other people at the house had already started walking towards them when the bottle was thrown. However, he stated that, actually, the victim was the first person to move out into the street towards the other men. He stated that when the victim first went out into the street, defendant was backing away from him in a walking crouch, showing the knife. His walk changed to a run when he got to an alley in the middle of the block. The victim ran after him, and caught up to him at the corner. McDonald stated that when defendant and the victim ran he followed, with the baseball bat in his hands. He admitted that he was running towards defendant when the victim was stabbed; the victim was also moving towards defendant at that time.

McDonald was also stabbed by defendant, but that stabbing occurred while McDonald was hitting defendant with the baseball bat. McDonald initially testified that defendant was yelling “help me,” but on redirect examination testified that he did not actually hear that. He thought that defendant had probably yelled something, because some of his friends did come to help him. He did hear someone other than defendant yell “whoee.”
(footnote: 1)
 Hector Manuel Valles testified at the pretrial hearing that he was one of the men who walked past 156 4th Avenue with the victim. He heard the word “Bishops” being used when the people at the house were yelling things. The group was calling them “Low Riders,” which is a gang in Moline; Valles made a gang sign in response, indicating that he was a member of the Sudenyo gang. Valles corroborated that several men showed up yelling on the street in front of McDonald’s house later on, but he could not identify anyone in the group. He testified that he and the others were sitting on the steps in front of the house, and he never saw the victim leave the house. He admitted that he was drunk at the time.

Omar Garcia testified at the pretrial hearing that he was also with the victim as they walked past 156 4th Avenue. There a group of men approached them and started yelling and “sending signs,” signifying their gang affiliation. The other group yelled, among other things, “Bishops” and “Low Rider killers.” He testified that a group of men later showed up at McDonald’s house, shouting similar things. He could not tell if they were the same men who had been shouting things before, and could not identify defendant as a member of the group. Garcia understood the shouting of “Low Rider killers” to mean that the other group thought that they were members of the Low Rider gang and wanted to beat them up because of that fact. He believed that the victim and McDonald did chase two men down the street after the yelling started at McDonald’s house. However, he stated that neither the victim nor McDonald had a bat.

The final witness at the hearing was former Bishop Timothy Geisler. Geisler, a Bishop at the time of the murder, was among the group of men at the rear of 156 4th Avenue on the morning in question. He stated that this address was Steve Jauregui’s house, and that defendant was inside the house at the time that the victim and the three other men walked past the front of the house. Defendant exited the house after the four men were escorted away by Officer McNabb. A few minutes later, defendant and Rosas left, walking down the alley. Geisler, Duran and Estaban ran after them when, a short while later, they heard the yell “whoee.” Geisler testified that this was a signal that the Bishops used if they were in trouble, to call other Bishops.

Geisler saw about 10 persons with bats, bricks and bottles approaching Rosas and defendant. Rosas was backing away from someone with a bat and tripped over the curb; when he fell, the assailant hit him with a bat. When Geisler ran over to help him, he saw the victim lying on the ground and saw someone hitting defendant with a bat by a pay phone. Geisler stated that the victim had the bat originally, and McDonald picked the bat up after his brother fell.

At trial, Geisler added a few details to his pretrial testimony. After the confrontation between the Bishops and the four men at Jauregi’s house, defendant and Rosas left, walking to the “Git ’N Go” convenience store. Shortly thereafter, Geisler heard one of them shouting “whoee,” and ran after them. He saw defendant and Rosas facing approximately 10 men. They were backing up, away from the crowd, and Geisler heard Rosas say “we don’t want to fight.” He saw Rosas get hit with a bat after he stumbled over a curb, and thereafter saw the victim hit defendant with a bat before defendant stabbed him.

At trial, Onis Garcez testified that he was with the victim as they walked past Jauregui’s house, and described that encounter essentially as had the other witnesses. He testified that the victim was not angry after that initial encounter, although he admitted that the victim was angry while the police officer was searching them. His testimony was impeached with a statement he had given shortly after the stabbing, in which Garcez told Detective Heist that the victim was “mad or something. Then he saw these guys pull up like in the middle of the alley. They started making signs and saying stuff to us. And [the victim] got up and he said like these guys are not going to f*** with me no more. I’m going to take them out.” At trial Garcez testified that this was not exactly what the victim said, because Garcez had been translating the victim’s Spanish into English for the benefit of the police. When pressed for specifics, he admitted that this was more or less what the victim had said, but the victim never used the word “kill.”

Jaime Rosas also testified only at trial. He stated that he was also known as Luis Rosas or Jaime Schweickhardt, and that he was about 5 feet 5 inches tall and 120 pounds. His testimony was consistent with the previous witnesses regarding the first encounter, at Jauregui’s house, although he stated that the four passers-by initiated gang references, saying “Sudenyos” first, before any of the Bishops said anything. With respect to the second encounter, he testified that when he left Jauregui’s house with defendant he had two purposes in mind; to walk to “Git ’N Go” and to see if the other group was still in the area. Defendant, however, was just going home. They saw the other men on the porch of McDonald’s house. Four men got up and started yelling “Sudenyos” at them; Rosas and defendant cursed at them in reply and the groups flashed gang signs at each other.

The four men left the porch and began walking towards Rosas and defendant. Rosas said they did not want to fight, but the men continued to advance. Rosas and defendant began to retreat backwards, and Rosas shouted “whoee,” to call for help. More people came at them, and Rosas and defendant ran; as Rosas ran, he was hit with a bat and fell. He did not see the stabbing, but did see defendant being hit with a bat later, by the pay phone. He did not think that the person hitting defendant at that time was the victim.

The forensic pathologist who performed the autopsy on the victim testified that the two main wounds to the victim were stab wounds, a fatal wound to the left chest which severed two major arteries and a contributing wound to the left of the abdomen. The pathologist also noted that the body had head wounds consistent with being hit with a baseball bat. The victim was 6 feet 3 inches tall and weighed approximately 170 pounds.

Sergeant Gregory Heist, of the Moline police department, was the State’s final trial witness. He brought defendant to the police station and interviewed him in the late morning hours of June 26. When he first saw defendant, Heist noted that defendant had a large knot on his head and a laceration on his leg, which Heist described in his report as “possibly a knife wound.” When first talking to Heist, defendant stated that he did not have a knife on the night of the offense and denied any involvement in the crime. According to Heist, defendant claimed he heard some men talking in Spanish while he was walking home; he fell, and did not remember anything further. Later, Heist confronted defendant with information that defendant had a knife at a party on the evening in question, and defendant said he was ready to tell the truth.

Defendant told Heist that he had been walking to the end of the alley to “check on things,” and when he got to the end of the block he overheard some people speaking in Spanish. He stated that he did not know what they were saying, because he did not understand Spanish. Defendant yelled “shut up, speak English, you f***ing Brazens [
sic
].” He then saw two or three persons walking towards him, and he backed up as they were getting closer, then decided to run. He also yelled “whoee,” to summon the other Bishops. He saw McDonald advancing on Rosas with a bat, and started over to help his friend, when the victim came after him.

Defendant told Heist that he thought the victim had something in his hand. Accordingly, defendant took out his knife and swung it back and forth in front of him to ward off the victim. After swinging the knife three or four times he realized that the victim was not going to back off, so he lunged at the victim with the knife. Defendant believed this was when he stabbed the victim. He thereafter ran off because he saw McDonald advancing on him with the bat. Defendant fell near a telephone booth and remembered being hit three or four times with a bat. He was dazed after this, but slightly recalled two of his friends walking him back to the Jauregui residence afterwards.

Defendant told Heist he did not know what was in the victim’s hands before the stabbing. He never told Heist that the victim had a bat and never stated that he had been struck with a bat before the stabbing. He at first told Heist that he had given his knife to one of his friends, then later said that he had thrown it away somewhere near the alley.

The State rested, and the defense’s motion for a directed verdict of acquittal was denied.

Nicholas Duran corroborated Rosas’ version of events at Jauregui’s house, stating that the four passers-by said something to the people at the house first, which caused them to come to the front of the house. Duran stated that he returned to the back yard after Officer McNabb ordered them to do so, and did not know what else had happened in the front of the house. He stated that no one discussed where Rosas and defendant were going when they left, but a short time after their departure, he heard the yell “whoee,” and he, Jauregui and Geisler ran down the alley after them. When they arrived at the mouth of the alley, they saw Rosas and defendant confronted by approximately 10 men, at least one of whom had a bat. He saw no weapon in the hands of Rosas or defendant, and he did not remember whether Jauregui or Geisler had a weapon. On this fact he was impeached with an earlier statement in which he told a police officer that Geisler had a bat. Duran admitted that Geisler may have had a bat, but he did not remember.

Duran went to a nearby vacant lot to find a brick or weapon to defend himself, and saw defendant being hit with a baseball bat by the pay phone, a short distance away. Duran distracted the man with the bat, keeping the phone between the two of them, and defendant ran.

Finally, defendant testified on his own behalf. He stated that he was 5 feet 6 inches tall, and weighed 128 pounds, the same size he was at the time of the events in question. He was at Jauregui’s house while Officer McNabb was there, but he stayed out of sight, in hiding, because he did not want any trouble with the police. He did not go to the front yard with the other people at the house, and when they returned to the back yard and he asked them what was going on, they told him it was not important.

He left to go home a short while later, walking through the alley with Rosas. When they reached the mouth of the alley, he heard people yelling in his direction in Spanish and he yelled at them to “shut the f*** up.” After this, several men came out into the street. Defendant temporarily lost track of Rosas as he backed away from the men, especially one man with a bat. He saw Rosas get hit with the bat and ran towards him to try to help him. At this point, the victim and McDonald, both of whom were bigger than him, came towards him. He could not clearly see the victim’s hands, because he was advancing with his body turned at an angle, his hands down low. Defendant thought at the time that the victim had a knife in his hands.

At this point defendant pulled out his knife. He waved it from side to side in front of him as he walked backwards, away from the men. McDonald was moving to defendant’s right; defendant thought that he was trying to circle around behind him. The victim moved as if to strike defendant, and defendant lunged at him. He then turned to run, but felt something hit his leg and he fell. As he tried to get up, McDonald hit him repeatedly with the bat. Eventually defendant got up, and ran to the alley. Defendant testified that he believed that the victim did in fact have a knife, because after the fight was over his leg had a puncture wound and a scratch where he was hit when he turned to run.

On cross-examination defendant admitted that he was a Bishop, as were most of the people at Jauregui’s house. He stated that he did yell “whoee” as he was backing up, which was a Bishop signal that he was in trouble and needed help. He did call the other men “Brazers,” which he stated was a term used to describe people from the Southwest who did not speak English. He also admitted he was never hit before he stabbed the victim.

The court held two instruction conferences. The first was informal, and was held off the record. The second conference was held on the record, and confirmed which instructions were to be given and by whom those instructions were submitted. Defendant and the State offered different verdict forms and instructions with respect to the issues raised in this appeal. The State’s instruction No. 19 was instruction No. 26.01A from the Illinois Pattern Jury Instructions, Criminal (3d ed. 1992) (hereinafter IPI Criminal 3d). According to this instruction, the jury would be told that it would receive three verdict forms: “ ‘not guilty’, ‘guilty of First Degree Murder’, and ‘guilty of Second Degree Murder,’ ” and instructed to select and sign only one of these verdict forms. The State offered corresponding verdict forms.

However, the State withdrew this instruction and verdict forms when defendant offered his instruction No. 17, which was IPI Criminal 3d No. 26.01B. According to this instruction–which was consistent with all of the instructions offered by the defense, which were given with no objection by the State–the jury was told that defendant was charged with two “types” of first degree murder: “Type A” and “Type B.” “Type A” was consistently used to refer to first degree strong probability murder (see 720 ILCS 5/9–1(a)(2) (West 1996)), and “Type B” was consistently used to refer to felony murder (see 720 ILCS 5/9–1(a)(3) (West 1996)). Defendant’s instruction No. 17 informed the jury that it would be given three verdict forms with respect to “Type A” first degree murder: “‘not guilty of first degree murder (Type A)’, ‘guilty of first degree murder (Type A)’, and ‘guilty of second degree murder.’ ” The jury was told that it should select and sign only one of these three verdict forms. The instruction further informed the jury that with respect to first degree murder (Type B) it would receive: “a ‘not guilty of first degree murder (Type B)’, and a ‘guilty of first degree murder (Type B)’ form of verdict.” The jury was also told that it should select and sign only one of these two verdict forms.

An additional instruction relevant to the issues in this case is defendant’s instruction No. 13, which was IPI Criminal 3d No. 7.06A. This instruction, given without objection by the State, informed the jury that “to sustain the charge of first degree murder (Type A) or the charge of second degree murder,” the State was required to prove that (1) defendant performed the acts which caused the victim’s death; (2) when he did so, defendant knew that his acts created a strong probability of death or great bodily harm to the victim; and (3) defendant was not justified in using the force which he used. This instruction specified that if the jury found that any of the above propositions had not been proven beyond a reasonable doubt, deliberations on these charges should cease and the proper verdict would be “not guilty of first degree murder (Type A).” The instruction goes on to specifically admonish the jury that it “may not consider whether the defendant is guilty of the lesser offense of second degree murder until and unless you have first determined that the State has proved beyond a reasonable doubt each of the previously stated propositions.”

After closing arguments and instructions the case went to the jury. At some point during deliberations the jury sent out a note asking the question, “How many of the forms do we fill out, all or just one we decided on?” On the record in chambers the parties and the court discussed how the court should respond. The court suggested that with respect to the charge of first degree strong probability murder, or “Type A” first degree murder, “there’s three verdict forms, not guilty, guilty of first degree murder, guilty of second degree murder. It’s in the instructions, but apparently those are complicated instructions. It seems to me my answer would be: as to Murder Type A, you pick one of the three verdict forms, and I cite what they are, which reflects your verdict.” With respect to felony murder, or “Type B” first degree murder, the court stated that “there’s two verdict forms, a not guilty and a guilty, and it would seem to me you would select a verdict form that represents your judgment in that.” The parties agreed with this course of action. The trial judge then left chambers and responded to the jury’s question orally, off the record. Shortly thereafter, the jury returned verdicts of not guilty of first degree murder, Type B, and guilty of second degree murder.

Defendant filed a post-trial motion for directed verdict of acquittal or for a new trial, which the court denied. In argument on the motion, the court noted that the jury had been instructed that as to felony murder, “you have a guilty and a not guilty; you sign one or the other. As to the Count II and III [first degree strong probability murder and second degree murder], I said: you have three verdict forms, a guilty verdict form as to first-degree murder, a not guilty verdict form as to first-degree murder, and then you have a guilty verdict form to count III, which is the second-degree murder.”

On appeal, the appellate court reversed and remanded for a new trial. The court held that defendant had been denied a fair trial because of the verdict forms which had been submitted to the jury in this case. Specifically, the court found the conviction infirm because of the lack of a general “not guilty” verdict form. Relying on 
People v. Cross
, 272 Ill. App. 3d 354 (1995), the court held that “[i]n a case, such as the one at bar, where the defendant was separately charged with the offense of second degree murder, we find that a verdict form which clearly reflects the absence of culpability for any of the charged offenses is especially vital.” No. 3–99–0048 (unpublished order under Supreme Court Rule 23). The court found that there was sufficient evidence admitted at trial to prove defendant guilty beyond a reasonable doubt, and accordingly remanded for a new trial; for purposes of guidance on remand, the court held that the trial court had not erred in admitting gang evidence. This appeal followed.

ANALYSIS

I. Verdict Forms.

The State contends that the appellate court erred in reversing defendant’s conviction based on the verdict forms. The State argues initially that defendant should be barred from challenging the propriety of the verdict forms on appeal, because defense counsel submitted the forms that were used. Moreover, the State contends that even if defendant’s complaint regarding the verdict forms is considered on the merits, it should be rejected because the proper IPI verdict forms were used, taking into account the fact that in this case defendant was charged with both first degree strong probability murder and first degree felony murder, the latter of which cannot form the basis for a second degree murder conviction. Defendant responds that the verdict forms were improper, as found by the appellate court. He maintains that if he is precluded from contesting the propriety of the verdict forms because his counsel submitted them, his counsel was ineffective for so doing.

Although the appellate court did not consider it, we deem it appropriate to begin our analysis by addressing the State’s waiver argument. We agree with the State that because defense counsel submitted the forms which were used, defendant cannot directly attack the verdict forms. “[W]here, as here, a party acquiesces in proceeding in a given manner, he is not in a position to claim he was prejudiced thereby.” 
People v. Schmitt
, 131 Ill. 2d 128, 137 (1989). Accord 
People v. Heard
, 187 Ill. 2d 36, 81 (1999); 
People v. Neal
, 142 Ill. 2d 140, 151-52 (1990); 
People v. McKinney
, 260 Ill. App. 3d 539, 542 (1994). Active participation in the direction of proceedings, as in this case, goes beyond mere waiver. To allow defendant to object, on appeal, to the very verdict forms he 
requested
 at trial, would offend all notions of fair play. See 
People v. Smith
, 71 Ill. 2d 95, 104 (1978) (noting that normally neither Rule 615(a), allowing parties to raise “[p]lain error,” nor Rule 451(c), which overrides waiver when “the interests of justice so require,” is applicable “where the instruction of which defendant complains on review is one which he himself tendered in the trial court”). “[I]t is well established that ‘an accused may not ask the trial court to proceed in a certain manner and then contend in a court of review that the order which he obtained was in error.’ ” 
People v. Segoviano
, 189 Ill. 2d 228, 241 (2000), quoting 
People v. Lowe
, 153 Ill. 2d 195, 199 (1992). Accord 
People v. Abston
, 263 Ill. App. 3d 665, 671 (1994) (“where the trial court’s course of action is taken at defendant’s suggestion and the defendant thereafter acquiesces in the court’s expressed course of conduct, the defendant should be precluded from raising such course of conduct as error on appeal”).

Defendant contends that counsel’s submission of the verdict forms in question constituted ineffective assistance of counsel, however. In addressing this argument we are guided by familiar principles. To demonstrate ineffective assistance of counsel, defendant must show (1) that his attorney’s performance fell below an objective standard of reasonableness, and (2) that the attorney’s deficient performance resulted in prejudice to defendant. 
People v. Williams
, 181 Ill. 2d 297, 320 (1998); 
Strickland v. Washington
, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). In this case, counsel was not ineffective because the verdict forms counsel submitted were appropriate.

Defendant contends that the appellate court was correct in holding that he was entitled to a verdict form which would have allowed the jury to simply find him “not guilty.” We disagree. The manner in which the trial court instructed the jury was wholly correct. The State’s instruction No. 19 (IPI Criminal 3d No. 26.01A) is to be used when the jury is to be instructed on first and second degree murder but not the insanity defense or guilty but mentally ill verdict, nor any other charges. It must be used with IPI Criminal 3d No. 2.01A. The latter instruction states that

“The defendant[s] [(is) (are)] charged with the offense of first degree murder. The defendant[s] [(has) (have)] pleaded not guilty. Under the law, a person charged with first degree murder may be found (1) not guilty; or (2) guilty of first degree murder; or (3) guilty of second degree murder.”

By contrast, defendant’s instruction No. 17 (IPI Criminal 3d No. 26.01B) must be used when the jury is to be instructed on first and second degree murder and some other charge or charges, but not the insanity defense or guilty but mentally ill verdict. It must be used with IPI Criminal 3d No. 2.01B, which states that

“The defendant[s] [(is) (are)] charged with the offense of first degree murder. The defendant[s] [(has) (have)] pleaded not guilty. Under the law, a person charged with first degree murder may be found (1) not guilty; or (2) guilty of first degree murder; or (3) guilty of second degree murder.

The defendant[s] [(is) (are)] also charged with the offense of ____. The defendant[s] [(has) (have)] pleaded not guilty to that charge.”

On its face, it would appear that defendant has a valid point. He was, indeed, charged only with second degree murder and first degree murder–albeit two different types of first degree murder. But therein lies the difficulty. We believe that first degree felony murder must be treated as a separate and different charge from first degree intentional murder or first degree strong probability murder in this regard. As we have recently held, a second degree murder instruction is inappropriate and must not be given with respect to a charge of felony murder. See 
People v. Morgan
, Nos. 88508, 88513 cons., slip op. at 34-36 (October 18, 2001) (also holding that the predicate felony underlying a felony-murder charge must have an independent felonious purpose, unlike an aggravated battery which caused the death of the victim). Had the court used the instructions submitted by the State, the jury could have based a verdict of second degree murder on a finding of guilt of felony murder. This would be inappropriate. A defendant cannot be found guilty of second degree murder based on a charge of first degree felony murder. Accordingly, for purposes of IPI Criminal 3d Nos. 26.01A through 26.01P, felony murder must be considered an “other charge” separate from a charge of first degree murder upon which a second degree murder conviction may be based.

Further, we do not believe that the IPI instructions should be changed so as to provide the jury with a general “not guilty” verdict when the defendant is charged with a type of first degree murder which could be mitigated to second degree murder and any other crime–including first degree felony murder. A general not-guilty verdict is used when the only charges before the jury are mitigatable first degree murder and second degree murder. See IPI Criminal 3d No. 26.01A. But where other charges are involved–including first degree felony murder–the jury should be required to enter separate judgments regarding defendant’s guilt on mitigatable first degree murder and on the other charges. Otherwise, the general “not guilty” verdict would operate or appear to operate to absolve defendant of guilt not only of the mitigatable charge of first degree murder and second degree murder, but of 
all
 charges, which might not be the intent of the jury. In the instant case, for example, had the jury been provided with a general “not guilty” verdict form for use in the first degree strong probability murder/second degree murder charges, the jury would have had to render apparently inconsistent verdicts if it had found defendant not guilty of first degree strong probability murder–thus having to fill out a general “not guilty” verdict–but guilty of first degree felony murder.

Accordingly, the instructions which were used at trial were the most beneficial accurate instructions which could have been given. The instructions provided a clear demarcation between the two ways in which defendant was charged with first degree murder. The jury was not given the option of improperly basing a conviction of second degree murder on the felony murder charge, nor was the jury faced with apparently inconsistent verdicts. Moreover, the jury received verdict forms corresponding to their instructions, avoiding the situation found to warrant reversal in 
Cross
.

II. Sufficiency of Evidence

In the alternative, defendant urges this court to reverse his conviction outright for insufficiency of the evidence. We decline to do so. As the State’s Attorney acknowledged in his closing statement, defendant’s lack of culpability was indeed established if the jury fully believed defendant’s testimony. However, defendant’s testimony and the defense testimony in general was not the only evidence adduced at trial. The jury, which was presented with conflicting versions of events, was entitled to choose among those versions. 
People v. Ortiz
, 196 Ill. 2d 236, 267 (2001) (“a fact finder need not accept the defendant’s version of events as among competing versions”). It is not our province to second-guess the verdict or to retry defendant on appeal. 
People v. Hall
, 194 Ill. 2d 305, 329-30 (2000). Rather, we will reverse defendant’s conviction only if, viewing the evidence in the light most favorable to the prosecution, no rational finder of fact could have found the crime to have been proved beyond a reasonable doubt. See 
Hall
, 194 Ill. 2d at 330, citing 
Jackson v. Virginia
, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); 
People v. Young
, 128 Ill. 2d 1, 49 (1989). We do not so find in this case. In short, the jury simply was not required to find that defendant reasonably believed that his life was in danger. Testimony differed regarding how close McDonald was to defendant when defendant committed the stabbing; defendant told Heist that McDonald only came at him after the stabbing.  Defendant did not tell Heist that he thought the victim had a knife; even at trial defendant never stated that he actually saw a knife. There was evidence that defendant did have a wounded leg after the fight, but the jury was not required because of this to conclude that the victim cut defendant as he was falling to the ground after being stabbed. No knife was ever found, nor did anyone see the victim with a knife. McDonald affirmatively testified that the victim did not have a knife or any weapon. Although the victim was bigger than defendant, this does not compel the jury to find that defendant 
reasonably
 believed that his life was in danger. Either verdict could have been reached in this case, but the evidence was not so one-sided as to compel reversal of the jury’s measured judgment.

III. Gang Evidence

Finally, defendant also contends that he is entitled to a new trial because the trial court erred in its decision to allow the prosecution to introduce evidence of defendant’s gang membership. We disagree.

Evidentiary rulings regarding gang-related evidence are reviewed for abuse of discretion. 
People v. Gonzalez
, 142 Ill. 2d 481, 489-90 (1991). Gang membership evidence is admissible only when there is sufficient proof that the membership is related to the crime charged. 
People v. Smith
, 141 Ill. 2d 40, 58 (1990). However, once such a relationship is shown, such evidence may be admitted so long as it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect. 
People v. Johnson
, 159 Ill. 2d 97, 118 (1994); see also 
People v. Lucas
, 151 Ill. 2d 461, 480 (1992), quoting
 People v. Monroe
, 66 Ill. 2d 317, 322 (1977), quoting Fed. R. Evid. 401 (“[e]vidence of gang affiliation and/or gang involvement in gang-related activity is relevant if it tends ‘ “to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence” ’ ”). One of the purposes for which gang evidence is admissible is to “provide a motive for an otherwise inexplicable act.”
 Smith
, 141 Ill. 2d at 58.

In the case at bar the trial court acted within its discretion in admitting the gang evidence. The State’s theory of the case was that the stabbing was not wholly innocent self-defense by one or two men being set upon by 10 men, as defendant claimed, but rather the result of gang-based violence which had begun earlier in the evening and escalated into a sortie by the Bishops to McDonald’s house. The usage of various gang-related boasts and taunts between the two groups, as well as the flashing of gang signs, substantiated this theory and helped to explain what occurred that morning.

CONCLUSION

For the reasons above stated, we reverse the decision of the appellate court and reinstate defendant’s conviction and sentence for second degree murder.

 Appellate court judgment reversed;

circuit court judgment affirmed.

FOOTNOTES
1:     
1
At various points in the record, this call was spelled “whooee” and “ooie.” We will use the spelling “whoee” throughout the text for the sake of consistency.