2025 IL App (2d) 240147-U
No. 2-24-0147
Order filed February 25, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-CM-278 |
| CHAD M. JOHNSON, | ) ) | Honorable Jill K. Konen, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Presiding Justice Kennedy and Justice Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) Defendant's claim that jury instructions and verdict forms established mandatory conclusive presumptions was foreclosed under the invited error doctrine where defense counsel participated in drafting the instructions and forms. (2) Defense counsel was not ineffective for promoting the allegedly flawed instructions and forms; counsel, as a matter of trial strategy, did not contest the supposedly presumed element, so there was no prejudice to defendant.

¶ 2    After a jury trial, defendant, Chad M. Johnson, was convicted of two counts of battery (720 ILCS 5/12-3(a)(2) (West 2020)). The trial court denied his postjudgment motion and imposed 24 months' supervision. On appeal, defendant contends that the jury instructions and verdict forms

created a mandatory presumption that relieved the State of its burden to prove an element of each offense. We affirm.

¶ 3                                          I. BACKGROUND

¶ 4      The State charged defendant with four counts of battery. The alleged victim was A.F., a minor, and all the offenses allegedly occurred on May 30, 2022. Count I alleged that defendant made physical contact of an insulting nature by kissing A.F. on the lips. Count II alleged that defendant made physical contact of an insulting nature by "plac[ing] his hands upon the buttocks of A.F. underneath her pants and underwear." Count III alleged that defendant made physical contact of an insulting nature by "pull[ing] himself into A.F. at which point A.F. felt his erect penis over [*sic*] his clothes." Count IV alleged that defendant made physical contact of an insulting nature by "pull[ing] [A.F.] against himself with his hands." We turn to the evidence at trial.

¶ 5      Brandon Stojan testified as follows. He resided in Sycamore with his parents. On one side of his house was the house of A.F., who was Stojan's niece and his mother's granddaughter. On the other side was the house of defendant, Tanya Harris, and their daughter, T.J. Stojan and defendant were longtime friends.

¶ 6      Stojan testified that, on May 30, 2022, at about 8:30 p.m., he saw defendant, A.F., and Jay Jacobsen standing in defendant's driveway. Stojan walked over and joined the conversation. After about half an hour, Jacobsen left, and the remaining three continued to talk for another 30 to 45 minutes. Their positioning changed during that time. Initially, A.F. was about six feet from defendant. At some point, A.F. turned to face the street while about a foot from both Stojan and defendant. Defendant moved toward A.F. until he was immediately next to her, such that "it didn't look like you could get a piece of paper between them." At that point, they were both in front of Stojan, who could not see either person's backside. Stojan saw defendant put his left hand on

A.F.'s shoulder. Stojan looked at defendant, who then took his hand away and stepped back. A couple of minutes later, at about 9:50 p.m., Stojan asked A.F. to leave with him and go home. Stojan noticed that defendant's garage door was up.

¶ 7    Stojan testified that, as he and A.F. walked down the sidewalk toward their homes, defendant called to A.F. and said that he had something to show her. At that point, defendant was standing directly in front of his garage. He told Stojan that he would walk A.F. home afterward, so Stojan left A.F. and continued toward home. When he got home, Stojan had a "weird feeling" about defendant. Stojan told his mother to call A.F., which she did. Stojan walked onto the sidewalk and saw that defendant's garage door was down. Stojan did not see defendant or A.F. He then saw defendant's garage door open. Defendant and A.F. exited the garage and walked toward Stojan's driveway, where defendant left A.F. Defendant went back home and closed his garage door. A.F. and Stojan entered his home, where she stayed a short time.

¶ 8    Stojan testified on cross-examination as follows. He did not see defendant place his left hand anywhere on A.F. but her shoulder. Defendant's hand was on her shoulder for about 15 to 20 seconds. When he took his hand off her shoulder, he "just lower[ed]" his hand. Defendant's hand was then "behind both [defendant and A.F.]" for about two or three minutes. Stojan did not see where defendant's hand went after he took it off A.F.'s shoulder. Later, when the garage door opened and A.F. and defendant exited, A.F. looked calm. Stojan estimated that A.F. was in defendant's garage for about five minutes; he did not recall telling the police that she was in the garage for about two minutes.

¶ 9    A.F. testified as follows. She was 17 at the time of trial, December 2023. Defendant moved in next door to A.F. in 2017 or 2018 and became a close family friend. "He was like a father figure[ ]" to A.F. On May 30, 2022, after defendant's family returned from vacation, A.F. went to

their home to visit T.J. Later, she joined defendant, Stojan, and Jacobsen in defendant's driveway. Stojan and Jacobsen were each about a foot from her, one facing her and one beside her. Defendant was also standing next to her; he was "[e]xtremely close." As she was "going in for like a side hug, *** [defendant] wrapped his [left] arm around [her] shoulder, and then it went down behind [her] back, and [it] touched over [her] clothes down on [her] butt." After he touched her butt, defendant raised his arm and placed it on her left shoulder.

¶ 10    A.F. testified that, sometime later, she and Stojan started to walk away. Defendant called her back, saying, "I want to show you something[.]" She walked back to defendant as Stojan walked home. She recalled that defendant wanted to show her "[s]ome type of license plate that he got from Jamaica[.]" She and defendant went into his garage, and he closed the garage door. He then "pulled [A.F.] close to him and *** rubb[ed] his hands up and down [her] back." Next, defendant's "hands went over [her] clothes, down [her] butt, and then that went on for a little while[.]" Defendant then "kind of pushed [A.F.] up against him." As he did so, A.F. felt "a hard penis." At that point, A.F.'s Apple Watch rang; she looked and saw that her grandmother was calling. She told defendant who was calling. Defendant "just kind of kept on going," but by the third ring, he broke his hold on her. Defendant opened the garage door, grabbed a "Flintstone [*sic*] license plate sign," and showed it to A.F. Defendant walked A.F. down his driveway and then halfway up the sidewalk to Stojan's home. A.F. saw Stojan outside, then entered and spoke to her grandmother. Afterward, she walked home. Her mother was asleep, but, the next morning, A.F. told her what had happened.

¶ 11    A.F. testified on cross-examination as follows. Jacobsen arrived at defendant's home at about 8:30 p.m. A.F., Jacobsen, Stojan, and defendant stood in a circle as they conversed, with defendant immediately to A.F.'s right. While Jacobsen was still there, defendant placed his arm

around A.F.'s shoulder, and A.F. placed her right arm around his waist. When defendant lowered his arm, he put it "[d]own [her] lower back" and "touche[d] [her] on the outside of [her] clothes on [her] butt." His hand never went underneath her clothing, but she acknowledged testifying in an earlier proceeding that defendant's hand went "under [her] shorts."

¶ 12    A.F. testified that she went to the Stojan house at 10 p.m. and left for home at 10:05 p.m. She did not recall testifying in an earlier proceeding that she left the Stojan home at 11 p.m. While at the Stojan house, she did not tell her grandmother or Stojan what happened between defendant and her.

¶ 13    A.F. acknowledged that, in June 2022, she told an interviewer at the Child Advocacy Center (CAC) that defendant had "put his hand down the back of [her] pants and glided to the front of [her] vagina." She admitted that this statement to the interviewer was not true.

¶ 14    A.F. also testified that, after she got the phone call from her grandmother, defendant stopped touching her. A.F. clarified that she received a phone call, not a text message, from her grandmother. However, she acknowledged that she testified in a prior proceeding that she received a text message.

¶ 15    A.F. also testified that, when she entered defendant's garage, she passed a shelf on which she saw the Flintstones license plate. She and defendant were in the garage for about five minutes.

¶ 16    Greyson Scott testified as follows. On June 1, 2022, when he was a detective with the Sycamore Police Department, he was told of A.F.'s allegations. That day, he spoke to defendant outside his home. Defendant said that he had "kind of a father-like relationship" with A.F. He said that she was a "hugger" and that they often greeted each other with a hug. Defendant told Scott that, on May 30, 2022, at about 9 p.m., after the others had left the driveway, he called A.F. into the garage to show her a plaque that he had bought at a rummage sale. Defendant claimed that this

occasion, when he was alone with A.F. in the garage, was the sole instance in which he deviated from his policy of "always ha[ving] someone else with him in the garage" when he was there with A.F. Defendant said that the garage door "accidentally closed" while they were inside together. He told Scott that, after showing A.F. the "Flintstone plaque," they left the garage and he escorted her home. Defendant denied that A.F. received a phone call while they were inside the garage.

¶ 17    Scott testified that he and another detective attempted to find and talk to defendant's and A.F.'s neighbors but were wholly unsuccessful.

¶ 18    Scott testified on cross-examination as follows. The two detectives did not obtain any text or call logs from A.F.'s electronic devices. On June 9, 2022, Stojan called Scott and asked how much time had elapsed from A.F.'s return to defendant's driveway until Stojan saw her and defendant exit the garage. Stojan estimated that time to be two to two-and-a-half minutes.

¶ 19    The State rested. The trial court granted defendant a directed verdict on count I (kissing).

¶ 20    In the defense case, Jacobsen testified as follows. He resided across the street from defendant and frequently visited. On May 30, 2022, at about 6 p.m., he took his dog for a walk, saw defendant and Harris, and conversed with them. About an hour later, Stojan arrived, and A.F. arrived shortly afterward. Jacobsen stayed in the driveway for about two hours. To his recollection, defendant and A.F. never stood next to each other or touched. He also did not recall seeing defendant's hand on A.F.'s shoulder or her arm around defendant. When Jacobsen left, Stojan and A.F. were still there.

¶ 21    Harris testified as follows. On May 30, 2022, she and defendant returned from a trip. She was inside her home by 7 p.m. and remained there for the night. While she was inside, A.F., Stojan, Jacobsen, and defendant were outside conversing. When defendant came inside, his demeanor was "[f]ine" and he did not seem upset or nervous. On May 31, 2022, Harris went shopping with A.F.'s

mother; they had no issues that day. On June 1, 2022, after defendant spoke with Scott, Harris learned of the allegations against defendant. At the time, A.F.'s family rented their home from Harris. In March or April 2022, after renting to them for three or four years, she informed the family that she would have to either raise their rent or sell the home.

¶ 22    Harris testified on cross-examination and redirect as follows. She had purchased A.F.'s family's home to help them after their landlord decided to sell the home. At some point after May 30, 2022, she had a management company take over the home's management. She did so because of what happened on June 1, 2022. She never told A.F.'s family before May 30, 2022, that she intended to terminate their lease; she had considered them good tenants and would not have terminated their lease except for financial reasons. However, she acknowledged that, in June 2022, the management company informed A.F.'s family that their lease would be terminated.

¶ 23    Defendant rested. At the jury instructions conference, the parties and the trial court approved People's Instruction No. 13, which adapted as follows Illinois Pattern Jury Instructions Criminal No. 11.05 (approved December 8, 2011) (hereinafter IPI Criminal No. 11.05), the definitional instruction for battery: "A person commits the offense of battery when he knowingly and by any means makes physical contact of an insulting or provoking nature with another person." The parties and the court also agreed to People's Instruction Nos. 14 through 16, which adapted IPI Criminal No. 11.06, the issues instruction for battery. That colloquy went as follows:

> "MS. McEACHERN [(ASSISTANT STATE'S ATTORNEY)]: [T]he next one is [People's Instruction No.] 14.
>
> MR. ERWIN [(DEFENSE COUNSEL)]: All right. And I think we're going to need three of these, then.
>
> THE COURT: Correct.

MS. McEACHERN: Judge, I did not know if—since it's the same charge of battery, if you wanted three separate [issues] instructions *** for battery. I do have separate like signature—

THE COURT: Verdict forms?

MS. McEACHERN: Like verdict forms, but I did not know if you wanted to read the proposition three times or if you wanted just once.

MR. ERWIN: I think we have to because it's three separate—

THE COURT: Okay, if you want to do it three times.

MS. McEACHERN: Yeah.

THE COURT: So [these] will be [People's Instruction Nos.] 14 through 16?

MS. McEACHERN: Yeah.

THE COURT: Given, okay.

*** Okay, so they're not going to have eight forms of verdict, it will be—

MS. McEACHERN: Yes, they will have six.

THE COURT: —Six."

¶ 24 The trial court then addressed People's Instruction No. 20, a verdict form for one of the battery counts. The verdict form read in part: "We, the jury, find the defendant, *** not guilty of Battery *** (insulting and provoking contact) (hands upon buttocks of A.F.)." The court asked if the verdict form should be given with the parenthetical description of the alleged contact (hands upon buttocks), and defense counsel replied, "Yes, so that way they know what they're—so I have no objection to that."

¶ 25 Later in the conference, the State noted that it had modified both the definitional and issues instructions to include parenthetical descriptions of each offense:

"MS. McEACHERN: Oh. Judge, I already spoke with Mr. Erwin. I had added those two extra [issues] instructions as we had discussed. I put in them the parentheses, descriptions of each count as was already in the verdict forms, I already showed that to Mr. Erwin, and I believe that there was no issues as to that, correct?

MR. ERWIN: Correct, no issues.

MS. McEACHERN: As well as I added to marry up with those three [issues instructions] just three separate [definitional instructions] in there with the same parentheses that were already previously in there."

¶ 26    As given to the jury in writing and from the bench, the modified definitional instructions for battery read:

"A person commits the offense of battery when he knowingly and by any means makes physical contact of an insulting or provoking nature with another person (hands upon buttocks of A.F.)."

"A person commits the offense of battery when he knowingly and by any means makes physical contact of an insulting or provoking nature with another person (pulled himself into A.F. where A.F. felt defendant's erect penis)."

"A person commits the offense of battery when he knowingly and by any means makes physical contact of an insulting or provoking nature with another person (defendant pulled A.F. against himself)."

¶ 27    People's Instruction Nos. 14 through 16, the modified issues instructions for battery, also specified, in parentheses, the particular conduct alleged as to each charge. The verdict forms were similarly phrased.

¶ 28    In its closing argument, the State conceded that the case hinged on witness credibility: A.F. said that defendant touched her inappropriately on the driveway. In contrast, defendant told Scott that he and A.F. merely hugged, with no improper contact. The State noted that the trial testimony was consistent on the events leading up to the alleged offenses in the garage: there was no dispute that, after A.F. and Stojan departed, defendant called A.F. back and, at his invitation, she went into the garage, where she was alone with him. What happened inside the garage was a sheer question of credibility. The State contended that A.F. testified credibly, as shown by her demeanor and lack of prejudice toward defendant. The minor inconsistencies in her account gave it credence. On the other hand, defendant was not credible in telling Scott that the garage door somehow closed by accident. Also, the State suggested that, if defendant wanted only to show A.F. the Flintstones plaque, he could have invited Stojan along instead of breaking his custom of having a third person in the garage when he was with A.F.

¶ 29    The State concluded that A.F.'s testimony was more credible than defendant's statements to Scott and that her testimony proved the elements of all three charges. However, the State never *specifically* argued that the charged acts were insulting or provoking.

¶ 30    In his closing argument, defense counsel emphasized that Stojan and A.F. contradicted each other on several matters, including the position of people in the driveway. A.F. testified that she was standing immediately next to defendant even while Jacobsen was present, but Stojan testified that defendant did not draw near to A.F. until after Jacobsen left. Also, A.F. was inconsistent on whether she received a text or a call while in the garage with defendant. Also, A.F. and Stojan (in his interview with Scott) gave different estimates of how long A.F. and defendant stayed in the garage. Further, A.F.'s testimony about where defendant touched her contradicted both her testimony in an earlier proceeding and what she told the CAC interviewer in June 2022.

¶ 31    As to defendant's credibility, counsel suggested that defendant could have reflexively, from habit, pressed the garage door opener when he entered the garage with A.F.

¶ 32    Counsel never contended that, if the jury credited A.F.'s testimony, it should nonetheless find a reasonable doubt of whether one or more of the charged acts was insulting or provoking.

¶ 33    The jury found defendant guilty of counts III (defendant "pulled himself into A.F. at which point A.F. felt his erect penis over his clothes") and IV (defendant "pulled [A.F.] against himself with his hands"). The jury found defendant not guilty of count II (defendant "placed his hands upon the buttocks of A.F. underneath her pants and underwear"). Defendant filed a postjudgment motion, which did not allege error in the jury instructions. The trial court denied the motion and imposed 24 months' supervision. Defendant timely appealed.

¶ 34                                      II. ANALYSIS

¶ 35    On appeal, defendant contends that the definitional and issues instructions for counts III and IV, and the corresponding verdict forms, denied him a fair trial because they created mandatory conclusive presumptions that the acts alleged were insulting or provoking, thus relieving the State of its burden to prove an element of each offense beyond a reasonable doubt. Defendant argues that, by placing the description of the alleged act in parentheses immediately following the reference to the element of "insulting or provoking" contact, each instruction and related verdict form communicated to the jury that the insulting or provoking nature of the alleged act had been settled and that, therefore, the State need only prove that he had committed the act alleged. Defendant notes that mandatory conclusive presumptions are unconstitutional because they relieve the prosecution of part of its burden of proof. See *County Court of Ulster County, New York v. Allen*, 442 U.S. 140, 156 (1979) (a presumption "must not undermine the factfinder's

responsibility at trial, based on evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt"); *People v. Woodrum*, 223 Ill. 2d 286, 308-09 (2006).

¶ 36    Defendant acknowledges that he has forfeited this claim of error by failing to raise it in the trial court. See *People v. Harvey*, 211 Ill. 2d 368, 385 (2004). However, he requests that we review it under the plain error doctrine because (1) the evidence was closely balanced and (2) the error was so fundamental that review is required regardless of the closeness of the evidence. See Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013) (substantial defects in jury instructions are not forfeited); *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007) (setting forth the two-pronged plain error doctrine). The State contends that plain error review is unavailable because defendant invited any error. We agree with the State.

¶ 37    "[P]lain-error review is forfeited when the defendant invites the error." *People v. Harding*, 2012 IL App (2d) 101011, ¶ 17. "[A] defendant may not request to proceed in one manner and later contend on appeal that the course of action was in error." *Id.* "Active participation in the direction of the proceedings *** goes beyond mere [forfeiture]." *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001).

¶ 38    The invited error doctrine has been applied against claims of error in jury instructions. In *Villarreal*, in which the defendant was charged with first degree murder and second degree murder and convicted of the latter, the appellate reversed his conviction because the jury had not been given a general " 'not guilty' " verdict form. *Id.* at 226. On the State's appeal, the supreme court reversed the appellate court, holding that the defendant was barred from raising the issue because his counsel had submitted the verdict forms used at the trial. *Id.* at 227. "To allow [the] defendant to object, on appeal, to the very verdict forms he *requested* at trial, would offend all notions of fair play." (Emphasis in original.) *Id.*

¶ 39    In *People v. Carter*, 208 Ill. 2d 309, 312 (2003), a first degree murder case, the appellate court reversed the defendant's conviction and remanded, holding that the trial court erred in not *sua sponte* issuing an instruction on involuntary manslaughter. The supreme court reversed the appellate court, relying on the invited error doctrine. *Id.* at 319. The court noted that, when the trial court asked the defendant whether he wished to submit an involuntary manslaughter instruction, he stated unequivocally that he did not. *Id.*

¶ 40    Finally, in *People v Patrick*, 233 Ill. 2d 62, 76 (2009), the defendant, convicted of second degree murder, argued that the trial court committed plain error when it tendered instructions that precluded the jury from considering a verdict of involuntary manslaughter until it first acquitted him of first degree murder. The supreme court held that plain error review was unavailable to the defendant because he had proffered the allegedly improper instructions to the trial court. *Id.* at 76-77.

¶ 41    Here, like the defendants in the foregoing cases, defendant did not simply fail to object to the jury instructions and verdict forms; rather, his counsel was an active voice in their preparation. When the trial court asked if the verdict forms needed parenthetical descriptions of the offenses, defense counsel appeared to suggest that the descriptions were necessary for the jury to distinguish among the counts. Counsel also pointed out that multiple issues instructions on battery were necessary because of the multiple counts—the State later modified those instructions to include the parenthetical descriptions that defense counsel approved in the verdict forms. Thus, defendant invited the error of which he complains and cannot seek plain error review.

¶ 42    Alternatively, defendant claims that defense counsel rendered ineffective assistance by agreeing to the instructions and verdict forms that defendant now challenges. Defendant argues that defense counsel could have avoided the flaws in the instructions and verdict forms by

specifying the particular alleged conduct at the outset of the applicable instruction or verdict form. He contends that the error was prejudicial because the evidence was closely balance both as to (1) whether he committed the acts and (2) whether they were insulting or provoking.

¶ 43    To establish the ineffectiveness of defense counsel, a defendant must demonstrate that (1) counsel's performance was objectively unreasonable and (2) it is reasonably probable that, absent counsel's deficient performance, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). For the following reasons, we hold that defendant's claim fails the second *Strickland* prong.

¶ 44    To explain our holding, we must place defendant's argument into its proper context: the proceedings at trial. To obtain a conviction of a given battery charge, the State needed to prove both that (1) defendant committed the alleged act and (2) the act was either insulting or provoking. At trial, however, defendant's counsel chose, as a matter of strategy, to contest only the first element of each charge. Defendant's closing argument embodied this approach: like the State, counsel framed the case solely as a credibility contest over whether defendant committed the alleged acts at all. Defendant does not contend that this strategy was unreasonable, and we shall not raise that issue *sua sponte* for him. In any event, counsel could reasonably have concluded that arguing that the alleged acts were not insulting or provoking would have only distracted the jury from the more serious and well-founded challenges to A.F.'s credibility, on which any conviction turned.

¶ 45    Given that defense counsel reasonably limited the defense's theory by contesting whether the charged acts occurred but not whether they were insulting or provoking, any mandatory presumption that the acts had that character did not prejudice defendant. Thus, it is not reasonably

probable that the trial result would have been different if the instructions and verdict forms were not deficient in the manner defendant asserts. Defendant's claim of ineffective assistance fails.

¶ 46                                    III. CONCLUSION

¶ 47     For the reasons stated, we affirm the judgment of the circuit court of De Kalb County.

¶ 48     Affirmed.