NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 220070-U

NO. 4-22-0070

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 19, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| AMARI McNABB, | ) | No. 19CF606 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Casey Costigan, |
| | ) | Judge Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's convictions of first degree murder and mob action were affirmed.
The trial court did not abuse its discretion by admitting evidence regarding gang
membership, defendant's internet search history, or a hole in defendant's jacket.
The court did not abuse its discretion in denying defendant's request to add
language to a pattern jury instruction. By failing to raise the issue during *voir dire*,
defendant forfeited his challenge to the racial composition of the jury. A rational
trier of fact could have found defendant guilty beyond a reasonable doubt of first
degree murder.

¶ 2        Following a jury trial in the circuit court of McLean County, defendant was found

guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2018)) and mob action (720 ILCS

5/25-1(a)(1) (West 2018)). The court sentenced defendant to a total of 28 years in prison.

Defendant appeals. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4 The State charged Scott Allen, Exodus Herbert, and defendant with first degree murder, mob action, and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(1) (West 2018)) in connection with the April 2, 2019, shooting death of Juan Nash. The court severed Allen's trial from defendant's and Herbert's trials. Following a jury trial in June 2020, Allen was convicted of all charges. That jury also found that Allen personally discharged a firearm. In February 2021, Herbert pleaded guilty to one count of first degree murder.

¶ 5 Generally, the State's theory against defendant was as follows. Defendant, Allen, and Herbert belonged to a gang called FBMG 200. Members of FBMG 200 believed that Nash's brother, Kajuan Hopson, killed one of their associates named Trevonte Kirkwood. On April 2, 2019, defendant, Allen, and Herbert saw Nash at a party in the streets and decided they would kill him because they were unable to kill Hopson. Defendant, Allen, and Herbert briefly left the party and went to a bowling alley to make plans. Defendant enlisted an unsuspecting friend, Brooklyn Turner, to take the group back to the party and essentially serve as their getaway driver. After returning to the party, while Herbert remained in Turner's car and ensured that she did not leave, defendant and Allen shot Nash multiple times. Although Nash was able to return fire, he died from his injuries within minutes. Accordingly, the State theorized that defendant either personally shot Nash or was accountable for Allen's actions in doing so. A fourth person, Justin Walls, accompanied defendant, Allen, and Herbert on the night of the shooting but was never charged in connection with Nash's death.

¶ 6 Defendant's theory was that the State could not prove that he planned or participated in Nash's shooting. Defendant also argued that the State could not negate the possibility that Nash was the initial aggressor.

¶ 7        Before defendant's trial, the State filed a motion *in limine* seeking to introduce extensive gang evidence. Defendant objected to that motion. After considering the evidence elicited at Allen's trial, the court ruled that it would allow gang evidence in defendant's trial. The court determined that evidence of gang membership was "directly relevant and highly probative to explain to the trier of fact as to why this incident happened." The court believed that, rather than inflame the passions of the jury, gang evidence would show motive and provide context for the shooting. The court found that the probative value of such evidence was not "substantially outweighed by its prejudicial effect."

¶ 8        The State also filed a motion *in limine* seeking to admit evidence that on April 11, 2019, Herbert was found to be in possession of a .380-caliber handgun. Although this gun was loaded with ammunition that resembled some of the ammunition used in Nash's shooting, this gun was excluded by the authorities as having been used in Nash's shooting. Accordingly, the court denied the State's request to admit evidence of Herbert's gun, determining that its prejudicial impact outweighed its probative value.

¶ 9        Defendant's case proceeded to a jury trial in late July 2021. Before testimony began, defendant filed a motion *in limine* to bar evidence of his internet search history and a hole in his jacket. The court denied those motions. This and all the other relevant evidence will be discussed in further detail below.

¶ 10                A. General Undisputed Facts About the Shooting

¶ 11        The evidence showed that on April 2, 2019, approximately 25 to 30 people gathered outdoors in the 1200 block of Orchard Road in Bloomington, Illinois. The event was called "Veedo Day" in honor of Da'Vid Parks, who had died. At approximately 9:45 p.m., gunfire erupted at the party. A total of 20 shots were fired from three guns. Specifically, the

police found fourteen 9-millimeter casings, two .25-caliber casings, and four .380-caliber casings. It was undisputed that Nash fired the 9-millimeter rounds.

¶ 12        Nash was shot through the heart with a .25-caliber bullet. He was also shot in both arms. Bullet fragments recovered from Nash's left arm showed that this bullet was a "38 Class caliber." The bullet that hit Nash's right arm exited his body and was not specifically linked at trial to a particular caliber weapon. However, a forensic pathologist testified that the wound in Nash's right arm was similar in size to the chest wound. All three shots that hit Nash were fired from a distance exceeding 18 to 24 inches.

¶ 13        The shot through Nash's heart did not kill him instantly. Before dying, Nash got into a vehicle, drove down the street, and crashed into a residence. When officers found Nash in the vehicle, there was a 9-millimeter handgun on the floor next to him. Police officers never located the other two guns involved in the shooting. Both Nathaniel Caldwell (a bystander) and Allen sustained nonfatal injuries from Nash's gunfire. Allen sustained gunshot wounds to his lower back.

¶ 14                            B. The State's Case-In-Chief

¶ 15        Few eyewitnesses to the shooting cooperated with the police during the investigation. Some who initially cooperated later claimed lack of memory when testifying at defendant's trial. No witness expressly stated that defendant shot Nash. Consequently, the State attempted to prove its theory against defendant circumstantially.

¶ 16        Rather than summarize the State's evidence witness by witness, we will focus on specific topics. We will first detail the gang evidence shedding light on the State's theory about what precipitated the events of April 2, 2019. We will then address a dialogue that Allen had on Facebook with an unknown person shortly before April 2, 2019, which the State claimed was

relevant to its theory that Nash's shooting was premediated. We will then relay chronologically defendant's activities on April 2, 2019. We will then recount defendant's statements to the police after the shooting. Finally, we will mention the evidence regarding a hole that was found in defendant's jacket.

¶ 17                                    1. *Gang Evidence*

¶ 18                         a. Jack McQueen's Identification of Gang Affiliations

¶ 19            Jack McQueen, a crime and intelligence analysis supervisor for the Bloomington Police Department, testified as an expert in the field of gang crime analysis. McQueen described both "traditional" and "hybrid" gangs. Although there are similarities between the two, according to McQueen, hybrid gangs lack a hierarchical structure and are not connected with gangs in other cities. McQueen opined that hybrid gangs are "more dangerous" than traditional gangs, as violence may occur from hybrid gangs without authorization from a gang hierarchy. According to McQueen, in downstate and central Illinois, it was common for people to simultaneously identify with both a traditional gang and a hybrid gang. McQueen explained that in early 2019, central Illinois agencies noticed gang members toting guns in fanny packs slung across the shoulders.

¶ 20            McQueen testified that FBMG 200 and MMG (also known as BBE) are among the hybrid gangs in the Bloomington-Normal area. Those two gangs are rivals, and there were 23 recorded instances of violence between them from April 2015 to April 2019.

¶ 21            McQueen testified that he used various sources to identify gang members, including self-admissions, use of gang signs, gang tattoos, reports from parents, and social media. McQueen distinguished between gang "members" and "associates." According to

McQueen, the difference is that gang associates do not involve themselves "actively in criminal activity."

¶ 22          McQueen identified Kirkwood, who was shot to death in Bloomington in October 2018, as an FBMG 200 associate. In support of that conclusion, McQueen relied on information from Kirkwood's social media accounts. The State introduced photographs posted on social media showing Kirkwood displaying FBMG 200 gang signs and promoting the Vice Lords. McQueen testified that the Vice Lords are a "traditional rival" of the Black Disciples. McQueen noted that Nash had the letters "B" and "D" tattooed on his shoulders, which was indicative of being a member of the Black Disciples.

¶ 23          McQueen identified Herbert as a member of both FBMG 200 and the Four Corner Hustler Vice Lords. The State introduced photographs of social media posts where Herbert made comments and used hand signs that pegged him as a gang member. McQueen also pointed out to the jury Herbert demonstrating gang signs in a rap video that another member of FBMG 200 posted on YouTube.

¶ 24          McQueen identified Allen as a member of both FBMG 200 and the Four Corner Hustler Vice Lords. Allen was in the above-mentioned rap video with Herbert. The State also introduced photographs of social media posts where Allen declared himself a gang member and bragged of his association with people who would kill for him.

¶ 25          McQueen identified defendant as a member of FBMG 200. McQueen pointed out defendant, Allen, and Walls displaying gang signs in a Facebook Live video. The State introduced photographs where defendant and others displayed gang signs. In one photograph, a person named Shawndell Wright had a fanny pack across his shoulder. The State also introduced a YouTube video titled "Mooskie Cappin for LS." This was a tribute rap video for Steven

Alexander, known as "Little Steve" or "LS," who died by homicide in summer 2018. (Alexander was Wright's brother.) Defendant, Wright, Allen, and Walls were among the people in this music video. In the video, Allen wore a fanny pack and held what appeared to be a handgun. The State also introduced three short videos recovered from defendant's phone. Those videos contained gang signs and references, and Herbert wore a fanny pack in one video.

¶ 26        Among the points that defense counsel highlighted during McQueen's cross-examination were (1) defendant did not have a criminal history, (2) the police had no information prior to this case that Nash was involved in a gang, (3) Wright was good friends with Nash, (4) Wright also had a relationship with defendant that was "not hostile," and (5) defendant lived in Las Vegas for years before Nash's shooting.

¶ 27                b. Hopson's Testimony Regarding Gang Affiliations and the

Motive for Nash's Shooting

¶ 28        Hopson testified that he did not remember defendant being a member of FBMG 200, though he said that defendant "hung out with them." Hopson was impeached with his statement to the police that defendant and Allen were members of FBMG 200. Hopson testified that MMG and BBE were "kind of" the same group, and neither of those groups got along with FBMG 200. Hopson testified that he personally associated with BBE but not with "any kind of larger gangs." Hopson was impeached with his statement to the police that both he and Nash identified as Black Disciples. Hopson testified that he did not know anything about the Vice Lords being in the area. Hopson was impeached with his statement to the police that "we don't f*** with" the Vice Lords, but the 200s do "with their sisters."

¶ 29        Hopson testified that he was not aware of FBMG 200 wanting retaliation for Kirkwood's homicide. However, Hopson also testified that he was in a car when somebody in

that car shot Kirkwood. Hopson testified that he then "hear[d] things" about himself "on the street," though he denied receiving any threats regarding Kirkwood's homicide. Hopson was impeached with his statement to the police to the effect that somebody nicknamed "Main" threatened him right before Nash was killed. Hopson testified that he did not know Main's real name, but Main was Allen's cousin.

¶ 30    Hopson testified that he did not know if any groups were out to get him after Kirkwood's death, and he did not feel during that time that he had to watch his back. Hopson was impeached with his statements to the police that (1) he thought Nash was killed because "they think I had something to do with that murder" and (2) "[t]hey wanted to retaliate on me thinkin' I did it, but they feel like they couldn't so they got to my brother."

¶ 31    On cross-examination, Hopson testified that defendant hung around gang members but was not necessarily a gang member himself. Hopson testified that he did not believe the theory that defendant shot Nash because defendant could not get to Hopson. Hopson did not think that defendant had any "beef" with him.

¶ 32    c. Other Witnesses' Testimony Regarding Gang Affiliations and Activities

¶ 33    Michael Holton, who was Nash's brother-in-law, testified that Allen was a member of FBMG 200. Holton did not know of any "beef" between Allen and Nash. Holton testified that neither he nor Nash were involved with a gang.

¶ 34    Emily Rogers, who once dated Herbert, testified that neither Herbert, Allen, nor defendant associated with any gang. Rogers was impeached with her statement to the police to the effect that she believed Nash's shooting was gang-related "crossfire." Rogers testified that, on unspecified occasions before the shooting, she had seen Allen, Herbert, and defendant pass

- 8 -

guns around. Rogers also told the police that on unspecified occasions she had seen defendant, Allen, and Herbert carry guns in fanny packs.

¶ 35 Wright testified that he did not recall with which gang Veedo associated. Wright was impeached with his statement to the police that Veedo was a Mickey Cobra. Wright testified that he did not remember with which gang he personally associated in April 2019. Wright was impeached with his statement to the police that he considered himself part of the "Veedo gang." Wright testified that he did not know with which gang Allen associated in April 2019, nor did Wright know whether Veedo knew Allen. Wright was impeached with his statements to the police that Allen was a Four Corner Hustler and that Allen did not know Veedo. Wright testified that he did not know with which gang Nash and Hopson associated. Wright was impeached with his statement to the police that Nash and Hopson were Black Disciples, and that Hopson was also affiliated with BBE.

¶ 36 2. *Allen's Facebook Dialogue with "Al Al Pacino"*

¶ 37 In the days before Nash's shooting, Allen communicated on Facebook with somebody whose account was labeled "Al Al Pacino." The police were unable to identify "Al Al Pacino." Of purported relevance to this case, Allen sent a message to "Al Al Pacino" on March 28, 2019, that said, "I'm tryna get u a full clip." At 2:58 p.m. on April 2, 2019, "Al Al Pacino" sent Allen photos from Wikipedia showing a Beretta 950 handgun. On that Wikipedia page, the cartridge associated with this firearm (*i.e.*, the size of the round it would fire) was listed as ".25 ACP" and ".22 Short." There were also seven phone calls between Allen and "Al Al Pacino" between 4:57 p.m. and 8:28 p.m. on April 1, 2019.

¶ 38 3. *Defendant's Activities on April 2, 2019*

- 9 -

¶ 39     According to an extraction report of defendant's phone, at around 3:20 a.m. on April 2, 2019, five separate internet searches were conducted in rapid succession for the following terms: "gt 380 pistol," "gt 380 pistol black n chrome," "gt 380 pistol," "gt 380," and "380 ct."

¶ 40     The party in the streets for "Veedo Day" started during the daytime on April 2, 2019. Attendees broadcasted video recordings of the event on Facebook Live, both during the day and during the evening. Although there was no recording of the shooting, the video recordings allowed investigators to identify some of the people who attended the party.

¶ 41          a. Defendant's First Trip to the Party on April 2, 2019

¶ 42     Turner testified that Nyrisha James picked her up at work in a tan car on April 2, 2019. They drove to Donnae Yates's house in Normal, Illinois. At Yates's house, Turner, Walls, Allen, and Herbert got into James's car. Turner did not recall who got into Yates's car. According to Turner, the group in James's car followed Yates to the party on Orchard Road. James and Turner dropped off Walls, Allen, and Herbert at the party. James and Turner then drove to James's sister's house.

¶ 43     Yates testified that defendant, Allen, Herbert, and Walls were at her house on April 2, 2019. Yates then drove three people, one of whom was defendant, from her home to the party on Orchard Road. Defendant was the only person in Yates's car who got out of the car on Orchard Road. Yates then saw defendant waiting on Orchard Road for Allen, Herbert, and Walls. Yates drove away from the party. Asked at trial whose idea it was to go to the party on Orchard Road, Yates said that "[s]omebody" called and said there was a party going on. Yates testified that nobody in her group had the idea to go to the party. Yates was impeached with her statement to the police that Allen wanted to go to Orchard Road.

¶ 44 On cross-examination, Yates testified that Wright alerted people to the party on Orchard Road. Yates further testified that when she drove defendant to the party, she did not hear any discussion about a possible conflict occurring at the party, nor did Yates see defendant with a weapon. However, according to Yates, when Walls was at her house before going to the party on April 2, 2019, Walls had a fanny pack across his chest with a gun in it.

¶ 45 The trial evidence did not establish exactly when defendant, Allen, Herbert, and Walls arrived at the party on Orchard Road for the first time. A police officer testified that he was able to identify defendant, Allen, Herbert, and Walls from a Facebook Live video taken at the party. This video appears to have been taken after the sun had gone down.

¶ 46 b. The Trip to the Bowling Alley

¶ 47 At some point, defendant, Allen, Herbert, and Walls left the party on Orchard Road and went to a bowling alley about a mile away. Surveillance video from the bowling alley shows the group arriving there at approximately 9:21 p.m. in a maroon car, which was driven by somebody who was not identified at trial. Defendant, Allen, Herbert, and Walls entered the bowling alley. In the surveillance video, Allen and Herbert can be seen wearing fanny packs slung across their shoulders. Allen, Herbert, and Walls sat down inside the main area of the bowling alley while defendant paced around talking on his cell phone. At one point, Allen can also be seen talking on a cell phone. At around 9:35 p.m., a tan vehicle arrived at the bowling alley. Defendant, Allen, Herbert, and Walls got into that vehicle and departed the bowling alley.

¶ 48 The State introduced an extraction report of defendant's phone reflecting his phone activity around the time the group went to the bowling alley. The call log shows that defendant communicated with Yates multiple times between 8:45 p.m. and 9:22 p.m. Yates testified that Herbert spoke with her on defendant's phone at some point during these calls.

Through Yates's testimony, and by impeaching her with her statements to the police, the State introduced evidence that the purpose of these calls was for defendant to see whether Yates would either give his group a ride or let them use her car. Yates testified that she did not go to the bowling alley to pick up the group.

¶ 49 According to defendant's call log, he called Ronald Thornton at 9:23 p.m. They had a second conversation at 9:30 p.m. Thornton did not testify at trial, so there was no evidence regarding the nature of these calls.

¶ 50 Defendant's call log shows a 1 minute and 50 second call from Wright to defendant at 9:32 p.m. At the time of this call, Wright was at the party on Orchard Road. Wright testified that he did not remember this phone call. Wright was impeached with his prior statement to the police that defendant told Wright to "move around." Wright testified that he did not know what it meant to "move around." However, in his police interview, Wright said that he interpreted "move around" to mean "to get out of the way from something" and that "[s]omething's fittin' to happen." Wright told the police that the reason he did not leave the party after being told to move around was that he knew something was not going to happen to him. However, Wright also told the police that he sat in his car after this call with defendant.

¶ 51 Wright testified that he did not know why defendant would tell him to move around. But Wright told the police that he believed this was out of respect for Wright's deceased brother, Alexander. Wright also told the police that he later asked defendant why defendant had said to move around. Defendant's response to that question was: "Bro, I promise you, it was not like that, bro. I'm telling you I just didn't want nothin' to happen to you, bro."

¶ 52 On cross-examination, Wright testified that he gave untrue information to the police about Nash's shooting. The defense also highlighted that Wright did not relay to his best friend Nash that there was any potential danger at the party.

¶ 53 Defendant's call log shows three calls to James between 9:25 p.m. and 9:28 p.m., and two calls to Turner at 9:31 p.m. and 9:35 p.m. James did not testify at trial. However, Turner was with James when James spoke with defendant. According to Turner, defendant called James asking for James to pick up him, Allen, Herbert, and Walls from the bowling alley. James did not want to go, so James asked Turner to pick them up. Turner then drove James's car from James's sister's house to the bowling alley to pick up the group.

¶ 54 Turner testified that she brought the group back to the party on Orchard Road. Defendant told Turner that they wanted to go to Orchard Road "to talk to their brother." According to Turner, on the ride back to Orchard Road, the group was "cheerful," and she noticed "nothing unusual." Turner did not hear anyone mention that there was going to be a conflict.

¶ 55                                          c. The Shooting

¶ 56 The State presented testimony from five witnesses who were present when the shooting occurred: (1) Turner, (2) Caldwell, (3) Daronte Thomas, (4) Holton, and (5) Wright. The State also presented testimony from three people living in the neighborhood who heard the gunshots.

¶ 57                                          i. *Turner's Account*

¶ 58 Turner testified that when she drove defendant, Allen, Herbert, and Walls from the bowling alley back to Orchard Road, "something" told her not to leave them there. Turner then testified that "they" asked her to stay, though she did not remember who made that request.

Turner acknowledged telling the police that defendant told her to stay because she was going to take the group home.

¶ 59 Turner testified that she parked, stayed there for about two minutes, and then turned her car around. After she turned her car around, Herbert returned to her car at a "skipping speed" and got in the front passenger seat. Turner testified that she and Herbert sat in the car for about three minutes before she heard gunshots. Turner then tried to drive off, but Herbert grabbed the steering wheel and said either "don't leave my brothers" or "we can't leave my brothers." Turner had to stop her car to avoid hitting another car. After Turner stopped, Allen, defendant, and Walls got in her car. Somebody said that Allen had been shot. Turner then sped to the hospital.

¶ 60 On cross-examination, Turner reiterated that she was sure defendant asked her to stay when she brought the group to the party on Orchard Road. However, Turner then testified that she stayed because she felt bad about leaving the group. Turner further testified that when Herbert returned to her car, he said that he was cold. Turner testified that she was shocked to hear gunshots, as she did not think there was going to be a problem at the party.

¶ 61 ii. *Caldwell's Account*

¶ 62 Caldwell was talking to people behind his truck when he heard gunshots. He ran away from the scene. Although Caldwell could tell that there was more than one gun firing shots, he did not see the shooting and did not know who was shooting. Caldwell did not know where Nash, defendant, Allen, or Herbert were immediately before the shooting started. Caldwell was shot three times from behind. Before the shooting, Caldwell did not sense any "beef" or conflict at the party.

¶ 63 iii. *Thomas's Account*

¶ 64 Thomas repeatedly responded to questions at trial by claiming that he had no recollection of events. To impeach Thomas, the State introduced portions of his recorded statement to the police. In that statement, Thomas mentioned that before the shooting, he saw four "boys" walk past him and go about five feet from Nash. Thomas provided descriptions of three of those individuals. An officer then showed Thomas a photograph taken from surveillance footage at the bowling alley. From that photograph, Thomas identified defendant, Herbert, and Walls as three of the individuals he had seen. Thomas told the police that he heard talking, but he could not say whether it was an argument. In his "peripheral," Thomas then saw one or two muzzle flashes coming toward Nash. Thomas did not see muzzle flashes coming from where Nash was standing. Thomas heard two different guns. He described hearing breaks between shots.

¶ 65 On cross-examination, Thomas testified that he was dishonest with the police. He testified that he was drunk "[a]nd much more" on the day of the shooting.

¶ 66                                     iv. *Holton's Account*

¶ 67 Holton saw both Allen and defendant at the party on Orchard Road before the shooting. Allen was wearing a fanny pack; defendant was not. Holton did not see anybody else with Allen and defendant. Holton saw defendant talk to Nash while Allen stood back toward Holton. Holton perceived it as some sort of "distraction" when Allen came up to him.

¶ 68 Holton testified that he could not hear what defendant and Nash were talking about until "the end." Holton testified that the conversation between defendant and Nash had to do with Nash's brother, Hopson. Holton did not notice anything unusual about the way defendant acted when talking with Nash. However, things got hostile when Holton heard Nash say "just

keep my brother out of this." Allen got involved in the conversation with Nash. Defendant and Allen walked about ten feet away together before coming back. Then there were gunshots.

¶ 69 Holton saw Allen fire the first shot, and Holton saw Nash fall. Holton did not see anyone else fire a gun. After the first shot, Holton ducked and ran. Holton did not see where defendant went "when all this happened."

¶ 70 v. *Wright's Account*

¶ 71 When gunshots rang out, Wright was in the driver's seat of his car, which was parked in a driveway nearby. Wright did not see who fired first. Nor did he know who drew a gun first. However, after Wright heard "a couple" shots, he looked up and saw Nash fall to the ground, jump to his feet, and then shoot about 14 times. Wright later testified that he did not know whether Nash had actually fully stood up before he started shooting. The first shots Wright heard sounded different from the 14 shots that Nash fired.

¶ 72 Wright did not see the people at whom Nash fired. However, Wright had seen four people—including Allen, defendant, and some other "dudes"—standing in front of or around Nash before Nash got knocked down. Just before shots were fired, Wright saw Nash talking to those four people. Specifically, Nash had walked up to the four people, telling Wright he was "going to holler at them." Wright did not hear any of the conversation between Nash and the four people. Wright did not hear loud voices, nor did it seem to him that things were escalating. Wright testified that he did not know whether those four people and Nash were involved in a disagreement. Wright was impeached on that point with a recorded jail phone call, wherein Wright mentioned Allen was involved with "a little disagreement *** about Kajuan" at Veedo Day. Wright testified that 5 or 10 minutes passed from when Nash went up to the four people and when the shots started.

¶ 73                                    vi. *What Neighbors Heard*

¶ 74         Three witnesses who did not attend the party on Orchard Road but lived nearby heard shots fired. One neighbor woke up to the sound of gunshots. She heard five consecutive gunshots, a pause, and then five more gunshots that sounded different. Another witness described hearing "continuous gunshots," followed by screeching tires and screaming. This witness clarified that there were pauses between series of multiple shots. A third neighbor testified that she heard gunshots in two different "sets."

¶ 75                                    d. Dropping Allen off at the Hospital

¶ 76         As mentioned, after the shooting, Turner, using James's car, drove Allen to the hospital. Also present in the car were defendant, Herbert, and Walls. Turner testified that everybody was panicking because Allen got shot. Surveillance footage from the hospital showed that defendant, Herbert, and Walls escorted Allen into the hospital at 9:54 p.m. They left Allen there and then rushed back outside within one minute. None of the men were wearing fanny packs when they entered the hospital.

¶ 77         The next day (April 3, 2019), the police searched James's car and found one fanny pack on the floor behind the driver's seat. Nothing of evidentiary value was found in the fanny pack.

¶ 78                                    e. Trip to Hillview Drive

¶ 79         According to Turner, after taking Allen to the hospital, she dropped off defendant, Herbert, and Walls at one of the "college houses" in Normal. Other evidence showed that this was an apartment building on Hillview Drive in Normal, which was about three miles away from the hospital.

¶ 80       Police officers were soon dispatched to this location on Hillview Drive for a report of somebody banging on apartment doors and talking about guns. The first officer arrived at 10:13 p.m. and found defendant and Herbert standing inside the entrance to a building. (The record does not reflect where Walls was at this point.) The officers' interaction with defendant and Herbert was cordial and was recorded by an officer's body camera. An officer asked defendant and Herbert for identification. Defendant produced an identification card, and Herbert gave his information verbally. An officer patted down both defendant and Herbert, and no weapons were found on them. Defendant told the officers that he had been dropped off by an Uber. The officers left defendant and Herbert at 10:19 p.m.

¶ 81       Yates testified that she picked up defendant and Herbert on Hillview Drive at some point that night. She said that the police were still in the area when she arrived. According to Yates, defendant and Herbert did not talk to her about what happened to Allen. She testified that she was not aware of any reason why they would not talk to her about what happened. Yates was impeached with her statement to the police that defendant and Herbert did not trust her and were "not going to talk about it in front of" her.

¶ 82       On April 4, 2019, police officers executed a search warrant at an apartment on Hillview Drive near where the officers had interacted with defendant and Herbert. They found nothing of evidentiary value.

¶ 83                    4. *Defendant's Statements to the Police*

¶ 84       The police interviewed defendant on April 3, 2019. The State played the entire 2 hour and 12-minute recording of the interview for the jury.

¶ 85       During the first part of the interview, defendant recounted the events of April 2, 2019, as follows. He was at Yates's house when he saw information on Facebook Live about a

gathering on Orchard Road. Defendant then called Allen, who was already over on Orchard Road. One of defendant's friends from Chicago arranged for defendant to take a Lyft to Orchard Road. Defendant was the only person who took that Lyft ride. The Lyft driver dropped defendant off down the street from the party. Defendant did not get all the way up to the party before he heard shots ring out. Without looking to see who was shooting, he ran to a McDonald's parking lot, where he called a friend to arrange another Lyft ride for him. Defendant then arrived at Jubar Thornton's house around 10 or 10:15 p.m. Allen's mother called defendant and told him that Allen had been shot. Defendant told the police that he did not know how Allen got to the hospital. Defendant said that he did not know whether Herbert had been on Orchard Road that day, but Herbert met defendant at Jubar Thornton's house.

¶ 86        The interviewers then showed defendant photographs, apparently ones taken from surveillance videos at the hospital showing defendant escorting Allen inside. Defendant then changed his story to the following. During the day on April 2, 2019, defendant was at Yates's house with some people, including Allen and Herbert. Allen saw something on Facebook Live about a gathering on Orchard Road. Defendant denied seeing Nash on Facebook Live before the group decided to go to Orchard Road. Defendant also said that he and his friends were "cool" with Nash. According to defendant, Allen and Herbert got a ride to Orchard Road in Turner's car, and defendant rode in Yates's car. Presumably referring to Walls, defendant said that he recently met "J" through Allen.

¶ 87        Defendant told the police that his group was at the gathering on Orchard Road for about 10 to 15 minutes before they went to a bowling alley in a black car driven by a woman whom defendant did not know. When they got to the bowling alley, nobody was there, and defendant did not have enough money to bowl. Defendant then called Turner, who came and

drove the group back to Orchard Road. The group asked Turner to park and wait at Orchard Road so that they would have a ride.

¶ 88          According to defendant, when he was at the party on Orchard Road the second time, Nash initiated a conversation with Allen. Defendant did not hear any threats exchanged, but he heard Nash getting loud. Specifically, defendant heard Nash bring up his brother, Hopson. Allen mentioned hearing that Hopson killed Kirkwood. Nash responded that he didn't "know nothing about that." Defendant said that he was about 10 to 15 feet from where Nash and Allen were speaking.

¶ 89          Defendant told the police that after about three to four minutes, he heard shots from the area where Nash and Allen were talking. However, defendant was not looking at anybody when the shots were fired. Thus, he did not see anybody "up a gun." When the shooting occurred, Herbert was in the car with Turner, and defendant did not know where Walls was.

¶ 90          Defendant told the police that as he was running away from the shooting, Allen told defendant that he got "hit." Defendant and others put Allen in Turner's car and took Allen to the hospital. Defendant then got rides to someplace on Hillview and then to Jubar Thornton's house. Defendant denied seeing anybody with a gun on April 2, 2019, and he denied being armed himself.

¶ 91                              5. *Defendant's Jacket*

¶ 92          On April 11, 2019, the police collected defendant's jacket from him. There was a small hole in the jacket near the zipper on the right side. The State introduced four pictures of the jacket, one of which showed a trajectory rod inserted through the hole. An officer testified that the purpose of photographing the jacket with the trajectory rod was "just to show that an item had passed through there."

¶ 93                    C. Defendant's Case-In-Chief

¶ 94         The defense presented one witness, Lance Williams, who was a professor of urban community studies at Northeastern Illinois University. He testified as an expert on gangs. Williams explained how the traditional model of street gangs had changed in the past 30 years due to the aggressive prosecution of gang leaders. He testified that today's hybrid gangs are a mixture of fragmented gangs and "drill rap," which is very popular music that celebrates the gang lifestyle. According to Williams, many young men are not actually gang members but emulate what they see in music videos. Williams testified that real gang members would not go to events in an opposing gang's territory. From reviewing the discovery materials in this case, Williams believed that FBMG 200 was a "clique" rather than a hybrid gang.

¶ 95                         D. Jury Instructions

¶ 96         The State tendered to the court Illinois Pattern Jury Instructions, Criminal, No. 5.03 (approved Oct. 28, 2016) (hereinafter IPI Criminal No. 5.03). That instruction provided:

> "A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense."

The defense requested to add to this instruction that "[m]ere presence at the scene of the crime isn't enough." The State objected to the addition but noted that defendant could claim in closing argument that "all he was was present." The trial court agreed with the State and denied defendant's requested additional language. The court instructed the jury using only the language in the pattern instruction.

¶ 97                          E. Deliberations, Verdict, and Sentence

¶ 98          During deliberations, the jury sent the court the following question: "If we determine that the [d]efendant is legally responsible for another named second person[,] then does the law require us to determine the guilt of the [d]efendant solely based on the possible guilt of that named second person[,] even if we don't agree that this is fair?" Without objection from the parties, the court told the jury that it had already been given its instructions.

¶ 99          The jury found defendant guilty of first degree murder and mob action but not guilty of aggravated discharge of a firearm. The jury found that the State failed to prove that during the commission of the offense of first degree murder, defendant personally discharged a firearm that proximately caused great bodily harm or death to another person.

¶ 100          Defendant filed a posttrial motion. In relevant portion, defendant argued that the court erred in admitting gang evidence, his internet search history, and the evidence of the hole in his jacket. Defendant also argued, without further elaboration, that he "was denied his Sixth Amendment Constitutional right to an impartial jury of his peers because there were no African American people on the jury." After entertaining brief oral argument from the parties, the court denied defendant's posttrial motion.

¶ 101          The court sentenced defendant to 25 years in prison for first degree murder, to be served consecutively to a 3-year sentence for mob action. Defendant timely appealed.

¶ 102                                   II. ANALYSIS

¶ 103                              A. Evidentiary Challenges

¶ 104          Defendant first challenges the admission of gang evidence, his internet searches, and the hole in his jacket. The State argues that the trial court properly admitted this evidence and that, if not, any error was harmless.

¶ 105      "The admissibility of evidence is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion." *People v. Brand*, 2021 IL 125945, ¶ 36. "An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable or when no reasonable person would agree with the trial court's position." *Brand*, 2021 IL 125945, ¶ 36.

¶ 106                    1. *Gang Evidence*

¶ 107      "Although there is 'widespread disapproval that exists toward street gangs,' a defendant may not insulate the fact finder from the fact of his gang membership, despite prejudice toward it, if that fact is relevant to understanding the case." *People v. Colon*, 2018 IL App (1st) 160120, ¶ 34 (quoting *People v. Gonzalez*, 142 Ill. 2d 481, 488-89 (1991)). "Relevant evidence is that which has any tendency to make the existence of a fact of consequence to the determination of the action more or less probable than it would be without the evidence." *People v. Williams*, 324 Ill. App. 3d 419, 431 (2001); see also Ill. R. Evid. 401 (eff. Jan. 1, 2011). "Gang-related evidence is admissible to show that the defendant acted with a common purpose or was part of a common criminal design, or to provide a motive for an otherwise inexplicable act." *Williams*, 324 Ill. App. 3d at 431. However, "[g]ang membership evidence is admissible only when there is sufficient proof that the membership is related to the crime charged." *People v. Villarreal*, 198 Ill. 2d 209, 232 (2001). "[O]nce such a relationship is shown, such evidence may be admitted so long as it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect." *Villarreal*, 198 Ill. 2d at 232.

¶ 108      We determine that the trial court did not abuse its discretion by admitting gang evidence in defendant's trial. The State theorized that the shooting occurred because members of FBMG 200 suspected that Nash's brother, Hopson, killed Kirkwood, an FBMG 200 associate.

For the following reasons, there was sufficient proof substantiating this theory to justify admitting gang evidence at defendant's trial.

¶ 109 There was sufficient proof that defendant, Allen, and Herbert were members of FBMG 200. There was also sufficient proof that Kirkwood associated with that gang. To that end, the record contains ample evidence of pictures, videos, and social media posts supporting a conclusion that defendant, Allen, Herbert, and Kirkwood were affiliated with FBMG 200.

¶ 110 There was also sufficient proof supporting the State's theory that Nash's shooting was gang related. Nash had the letters "B" and "D" tattooed on his shoulders, which supported an inference that he was a member of the Black Disciples. Hopson also told the police that Nash was a Black Disciple. Hopson testified that he personally associated with BBE, and he acknowledged that BBE and FBMG 200 did not get along. The State's gang expert, McQueen, likewise testified that FBMG 200 and BBE were rival gangs. Hopson admitted being in a car when someone in that car shot Kirkwood. Hopson told the police that (1) he thought Nash was killed because "they think I had something to do with" Kirkwood's murder and (2) "[t]hey wanted to retaliate on me thinkin' I did it, but they feel like they couldn't so they got to my brother."

¶ 111 Moreover, Holton, who was present when Nash was shot, testified that he heard defendant and Nash discussing Hopson before shots were fired. According to Holton, he heard Nash say "just keep my brother out of this." Holton testified that Allen got involved in that conversation and then fired the first shot. Similarly, Wright, who was present when Nash was shot, was recorded on a jail phone call saying that Allen was involved with "a little disagreement *** about Kajuan" at Veedo Day. Defendant echoed this sentiment in his statement to the police, telling them that Allen and Nash discussed Hopson and Kirkwood before shots were fired.

¶ 112    Thus, there was evidence linking defendant to a gang and evidence that Nash's death was gang related. Those facts distinguish this case from the cases defendant cites where reviewing courts determined that gang evidence was impermissible. See *People v. Smith*, 141 Ill. 2d 40, 60 (1990) (noting that "the evidence simply failed to establish that defendant was affiliated with the King Cobras"); *People v. Roman*, 2013 IL App (1st) 110882, ¶ 30 (noting that the State "did not present any evidence at trial to support" its theory that a murder was gang related). Here, evidence of gang membership and gang motives provided context for the otherwise inexplicable fact that 20 bullets were fired from three guns at a crowded party. The trial court reasonably determined that gang evidence was more probative than prejudicial. We cannot say that the trial court's decision to admit gang evidence constituted an abuse of discretion.

¶ 113    2. *Internet Searches*

¶ 114    We likewise conclude that the trial court did not abuse its discretion by admitting evidence that, around 3:20 a.m. on April 2, 2019, there were internet searches conducted on defendant's phone relating to a "gt 380 pistol." Police officers found four .380-caliber casings at the scene of the shooting on Orchard Road. It could have been pure coincidence that defendant conducted these internet searches and then found himself hours later at a party where a shooting happened. However, " 'that a different, reasonable inference might be drawn from the same evidence does not make the inference which the State chose to argue improper or impossible.' " *People v. Zirko*, 2012 IL App (1st) 092158, ¶ 43 (quoting *People v. McInnis*, 88 Ill. App. 3d 555, 575 (1980)). The evidence of defendant's search history was relevant, as it made the State's theory that defendant planned and participated in Nash's shooting "more probable" than that theory would have been without this evidence. Ill. R. Evid. 401 (eff. Jan. 1, 2011).

¶ 115 In challenging this evidence, defendant asserts that the internet searches "tended to mislead the jury and unfairly prejudiced them against [defendant] based on the risk that they would conflate the searches with the purchase, procurement, possession, or firing of a firearm." Defendant's argument is unpersuasive. The jury obviously was not misled or prejudiced by defendant's internet searches, as the jury found that defendant did not personally discharge a firearm. The trial court reasonably found that the probative value of defendant's internet searches outweighed their prejudicial impact.

¶ 116 Defendant also suggests that he may not have personally conducted these internet searches. He notes that Yates testified that on the evening of April 2, 2019, she spoke with Herbert, who was using defendant's phone. However, there was no indication at trial that anyone other than defendant had access to his phone around 3:20 a.m. on April 2, 2019. It was a reasonable inference from the evidence that defendant conducted these internet searches.

¶ 117 Defendant further mentions that the trial court prohibited the State from introducing evidence that Herbert possessed a .380-caliber handgun on April 11, 2019. The court ruled as it did on that issue because this firearm was excluded as having been used in Nash's shooting. The ruling as to Herbert's firearm had no relation to the evidence of defendant's internet search history.

¶ 118                          3. Defendant's Jacket

¶ 119 Defendant also argues that the court should have excluded photographs depicting a hole in his jacket, including one photograph showing a trajectory rod inserted through the hole. The following additional facts are relevant to this argument.

¶ 120 Before opening statements, defendant filed a motion *in limine* seeking to bar evidence that there was a hole in the jacket that officers collected from him on April 11, 2019.

Defendant argued that evidence of the hole in the jacket was irrelevant and risked misleading the jury that the hole was caused by a bullet. When defendant presented his motion to the court, the State noted that defendant was identified by his "distinctive jacket" in videos taken on the night of the shooting. The State further argued: "[W]e believe that the defendant has brought the issue of this jacket and whether or not these are bullet holes by his own statements. We do have statements from the defendant regarding his jacket that are relevant and could potentially come in at trial." It is not apparent which specific statements the prosecutor was referencing.

¶ 121 The court denied defendant's motion *in limine*. The court determined that "the jacket goes to identification." In the court's view, "in terms of whether this is a bullet hole or not [a] bullet hole, the jury can make up their mind in terms of what they perceive it to be."

¶ 122 At trial, the State introduced photographs of defendant's jacket, including one that showed a trajectory rod inserted through the hole. A detective whom the State used to introduce these photographs testified that the trajectory rod was "just to show that an item had passed through there." No witness testified that the hole in defendant's jacket was a bullet hole or even looked like one.

¶ 123 In closing argument, the State referred to defendant's jacket for identification purposes. For example, while showing the jury a video that was taken at the party on Orchard Road and posted on Facebook Live, the prosecutor said: "You can see [defendant] in his distinct puffy coat, light jeans with the fade spots and his hat." However, the State also asserted that the hole in defendant's jacket was a bullet hole caused by Nash firing in self-defense:

> "[W]hen you get shot in the chest and you have your own gun, you fire back at the people shooting at you. And that's why [defendant] has a bullet hole in his jacket. Now, his bullet hole—his jacket wasn't zipped up. In any of the videos we

watched, his jacket was never zipped. It's running free. And he's running. He's perpendicular, it goes through his coat. Why would there be a bullet hole in [defendant]'s coat? Because [Nash] is shooting back at the people shooting at him."

Defense counsel objected to this comment, arguing that there was no evidence that the hole was a bullet hole. The court overruled the objection, stating: "Reasonable inferences from the evidence. The jury can make up their own mind."

¶ 124      Defendant's argument on appeal with respect to the jacket is multifaceted. He attacks both the trial court's pretrial decision to allow this evidence and the State's manner of using this evidence in its closing argument. Defendant argues that the evidence of the hole in the jacket was not probative, as there was no evidence "to support the suggestion this was a bullet hole, let alone one connected to the shooting." Defendant further argues that the State should not have been allowed to argue that the hole in the jacket was a bullet hole without presenting expert evidence of that fact. Defendant maintains that the jacket was not needed at trial for identification purposes, as defendant was seen wearing this jacket in multiple surveillance videos, and he admitted being at the party on Orchard Road. Defendant also contends that the evidence of a hole in the jacket was highly prejudicial.

¶ 125      The State responds that the court acted within its discretion by admitting photographs of the jacket. According to the State, "defendant's argument is somewhat backward-looking," insofar as he challenges a pretrial ruling based on what later occurred at trial. The State maintains that defendant's discussion of expert testimony in his brief is misplaced, as no witness testified to any bullet's trajectory in connection with defendant's jacket. The State proposes that the jacket itself was probative for purposes of identification, and the hole was "probative to show

defendant was at the scene of a shooting and that it was possible Nash fired shots in the direction of defendant and Allen." Moreover, the State insists defendant suffered no prejudice from the evidence of the hole in his jacket. On that point, the State notes that the evidence showed Nash fired a gun in defendant's direction, and defense counsel suggested in closing argument that Allen fired at Nash in self-defense.

¶ 126     We determine that the trial court properly admitted evidence of defendant's jacket for identification purposes. The jacket was relevant because it allowed police officers to identify defendant from available video footage. Considering that defendant admitted being at the scene of the shooting, there was nothing inherently prejudicial about the jacket.

¶ 127     We also determine that the court acted within its discretion by allowing the State to introduce evidence of the hole in defendant's jacket. No witness testified that the hole was a bullet hole. In closing argument, the court allowed the State to urge the jury to make certain inferences about the nature and cause of the hole in defendant's jacket. However, the court also instructed the jury that "[n]either opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded."

¶ 128     Even if the admission of the evidence of the hole in defendant's jacket was error, the error was harmless.

> "[W]hen deciding whether error is harmless, a reviewing court may (1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly

admitted evidence is merely cumulative or duplicates properly admitted

evidence." *People v. Becker*, 239 Ill. 2d 215, 240 (2010).

We determine that the evidence of the hole in defendant's jacket did not contribute to

defendant's conviction. The State used this evidence in closing argument to support its theory

that defendant shot Nash and that Nash returned fire in self-defense. The jury rejected that

theory, finding that the State failed to prove its allegation that defendant personally discharged a

firearm. Thus, there was no reversible error.

¶ 129                                    B. Jury Instruction

¶ 130        Defendant also argues that the trial court erred by failing to instruct the jury that

"[m]ere presence at the scene of the crime isn't enough" to sustain a conviction under

accountability principles. The State responds that the trial court properly refused to add language

to IPI Criminal No. 5.03, which addresses accountability.

¶ 131        According to Illinois Supreme Court Rule 451(a) (eff. April 8, 2013), the trial

court shall use an available pattern instruction, "unless the court determines that it does not

accurately state the law." We review for an abuse of discretion the trial court's decision not to

instruct the jury with nonpattern "mere presence" language. *People v. Nutall*, 312 Ill. App. 3d

620, 633 (2000).

¶ 132        The appellate court has repeatedly held that juries need not be instructed explicitly

that mere presence at the scene of the crime is insufficient to prove accountability. See, *e.g.*,

*Nutall*, 312 Ill. App. 3d at 634-35; *People v. Thomas*, 175 Ill. App. 3d 521, 530 (1988). Although

"mere presence" language is legally accurate, it is "already incorporated in or encompassed by"

the language in other pattern instructions, including IPI Criminal No. 5.03. *Thomas*, 175 Ill. App.

3d at 529; see also *Nutall*, 312 Ill. App. 3d at 634 (finding it relevant that the jury there was

"given the IPI instructions on the presumption of innocence, the burden of proof, the definition and elements of murder[,] and the proof necessary to find defendant guilty under an accountability theory").

¶ 133    We agree with those appellate decisions. Here, the court instructed the jury as follows:

> "A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense."

Pursuant to this instruction, accountability obviously demands more than mere presence at the scene of a crime. Additionally, the court here instructed the jury that defendant was presumed innocent and that the State bore the burden of proof. The court also instructed the jury regarding the elements of first degree murder. Under these circumstances, we determine that the trial court did not abuse its discretion by refusing to add language to the pattern instructions.

¶ 134    In urging a contrary conclusion, defendant notes that the legislature amended the accountability statute in 2010. One of the amendments was to specify that "[m]ere presence at the scene of a crime does not render a person accountable for an offense." Pub. Act 96-710 (eff. Jan. 1, 2010) (amending 720 ILCS 5/5-2(c) (West 2008)). However, the 2010 amendment to the accountability statute was merely codification of well-established case law. See *People v. Thicksten*, 14 Ill. 2d 132, 134-35 (1958) ("While mere presence or negative acquiescence is not enough to constitute a person a principal, circumstances may show there is a common design to do an unlawful act to which all assent."). Thus, the 2010 amendment to the accountability statute

does not change our analysis of whether a jury must be instructed explicitly with "mere presence" language.

¶ 135 Defendant mentions in passing that the jury sent a question during deliberations. See *supra*, ¶ 98. However, the jury did not ask whether it could convict defendant merely because he was present when the shooting occurred. The jury's question is not relevant to our analysis.

¶ 136 C. Racial Composition of the Jury and the Venire

¶ 137 Defendant next argues that the lack of African Americans on the jury and in the venire violated his rights under the Sixth Amendment to the United States Constitution. Although defendant acknowledges that the record does not indicate the racial composition of the venire, defendant asserts in a footnote that "there were no Black jurors in the entire jury venire." After asking us to take judicial notice of the racial composition of Bloomington, Normal, and McLean County, defendant contends that "the jury and the jury pool did not reflect the racial makeup of the county." From that premise, defendant asks us either to order a new trial or, alternatively, to "remand the case for further evidentiary hearing to more adequately develop the record."

¶ 138 The State argues that defendant failed to raise this issue in a timely manner. The State also notes that the record does not include basic factual information that would be relevant to a claim of this nature. The State further maintains that defendant "makes no attempt to describe or discuss" the requirements that have developed under case law to show a constitutional violation.

¶ 139 We determine this claim is forfeited. Defendant did not challenge the racial composition of the venire below. In his motion for a new trial, defendant asserted, without

further elaboration, that he "was denied his Sixth Amendment Constitutional right to an impartial jury of his peers because there were no African American people on the jury." This is insufficient to preserve the claim for review. Section 114-3(a) of the Code of Criminal Procedure of 1963 provides, in relevant portion: "Any objection to the manner in which a jury panel has been selected or drawn shall be raised by a motion to discharge the jury panel prior to the *voir dire* examination." 725 ILCS 5/114-3(a) (West 2020). Such motion "shall be in writing supported by affidavit and shall state facts which show that the jury panel was improperly selected or drawn." 725 ILCS 5/114-3(b) (West 2020). The movant bears the "burden of proving that the jury panel was improperly selected or drawn." 725 ILCS 5/114-3(c) (West 2020). A defendant who fails to comply with this procedure may not challenge on appeal the racial composition of the venire. See *People v. Fomond*, 273 Ill. App. 3d 1053, 1055 (1995) ("We agree with the State that the defendant has waived review of this issue by failing to challenge the venire by a written motion supported by affidavit.").

¶ 140        Due to defendant's failure to raise the issue below sufficiently and in a timely manner, the record does not contain the information that would be necessary to evaluate defendant's claim. Specifically, the record does not reflect the racial composition of defendant's jury or the venire, nor do we have any information about McLean County's process for selecting jury pools. Accordingly, we deem the argument forfeited and will not consider it.

¶ 141                          D. Sufficiency of the Evidence

¶ 142        Finally, defendant challenges whether the State proved him guilty of first degree murder beyond a reasonable doubt. Defendant does not specifically challenge his conviction of mob action. We hold that the evidence was sufficient.

¶ 143      We note that in his appellant's brief, defendant relies exclusively on *People v. Wright*, 43 Ill. App. 3d 458 (1976). The court in *Wright* applied the "reasonable-hypothesis-of-innocence" standard, which has since been abandoned by Illinois courts. *People v. Walker*, 2020 IL App (4th) 180774, ¶ 79.

¶ 144      In reviewing a challenge to the sufficiency of the evidence, the question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Fernandez*, 2014 IL 115527, ¶ 13. We remain cognizant that "it is the responsibility of the jury, as the trier of fact, to determine the credibility of the witnesses and the weight to be given to their testimony, to resolve any inconsistencies and conflicts in the evidence, and to draw reasonable inferences therefrom." *People v. Salazar*, 2014 IL App (2d) 130047, ¶ 55.

¶ 145      Defendant was convicted of first degree murder under an accountability theory. One way for the State to obtain a conviction for first degree murder is to prove that a defendant killed an individual, without lawful justification, while intending to kill or do great bodily harm to that individual. 720 ILCS 5/9-1(a)(1) (West 2018).

¶ 146      A person is legally accountable for the conduct of another when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2018). "[T]o prove that a defendant possessed the intent to promote or facilitate the crime, the State may present evidence that either (1) the defendant shared the criminal intent of the principal, or (2) there was a common criminal design." *Fernandez*, 2014 IL 115527, ¶ 13. The difference between the two theories is that pursuant to the common criminal design theory, a defendant may be legally

accountable for a crime committed by another person even if the defendant did not intend to promote or facilitate that particular crime. See 720 ILCS 5/5-2(c) (West 2018) ("When 2 or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts.").

¶ 147   Although "[m]ere presence at the scene of a crime does not render a person accountable for an offense," the jury may consider the defendant's presence, along with other circumstances, when determining guilt. 720 ILCS 5/5-2(c) (West 2018). Other relevant circumstances include whether the defendant fled from the scene of the crime, whether the defendant maintained a close affiliation with his or her companions after the commission of the crime, and whether the defendant failed to report the crime. *People v. Garcia*, 2019 IL App (2d) 161112, ¶ 27.

¶ 148   Here, the State argues that defendant was accountable under either a shared criminal intent theory or a common criminal design theory. For the following reasons, we hold that, in the light most favorable to the State, a rational trier of fact could have found defendant accountable for first degree murder under a shared criminal intent theory. Accordingly, we need not address whether defendant was accountable by virtue of a common criminal design.

¶ 149   A rational trier of fact could have found that Allen shot Nash and that Allen was the aggressor. To that end, Holton testified that he saw Allen shoot Nash first. The evidence also showed that Allen sustained gunshot wounds to his lower back, whereas Nash was shot directly in the center of his chest. A reasonable inference from this evidence is that Allen shot Nash and then Nash shot Allen as Allen was retreating.

¶ 150　　　　As discussed above in connection with defendant's arguments regarding the admission of gang membership, there was evidence supporting the State's theory that members of FBMG 200, including defendant and Allen, had a motive to shoot Nash. There was evidence that some people believed that Nash's brother, Hopson, had killed Kirkwood. Additionally, defendant told the police that Allen and Nash discussed Hopson before shots were fired. Holton testified that he heard a conversation between defendant and Nash having to do with Hopson. A rational trier of fact could have concluded from this evidence that defendant and Allen had a motive to shoot Nash.

¶ 151　　　　Based on the following circumstances, a rational trier of fact also could have found that defendant participated in planning Nash's shooting and arranged a getaway car.

¶ 152　　　　The evidence supported an inference that when defendant and Allen went to the party on Orchard Road for the first time on April 2, 2019, they would have seen Nash among the crowd. To that end, in a Facebook Live video, Nash can be seen walking around in his distinct black and white checkered sweatshirt, not far from Allen.

¶ 153　　　　The evidence showed that an unidentified person drove defendant, Allen, Herbert, and Walls from the party on Orchard Road to a bowling alley. When the foursome entered the bowling alley, Allen and Walls had fanny packs around their chests. A reasonable inference from the evidence was that there were guns in those fanny packs. On that note, Yates testified that she saw Walls with a gun and a fanny pack before they left for Orchard Road the first time on April 2, 2019. Rogers, who once dated Herbert, had previously seen Allen, Herbert, and defendant pass guns around and carry guns in fanny packs. McQueen explained that in early 2019, central Illinois agencies noticed gang members toting guns in fanny packs slung across the shoulders.

¶ 154    Notably, defendant, Allen, Herbert, and Walls did not bowl or play arcade games in the 15 minutes or so that they were at the bowling alley. Rather, defendant made phone calls to arrange a ride in a different car back to the party they just left. There was also evidence that defendant told Wright in a phone call to "move around," which the jury reasonably could have determined was a warning that something was going to happen at the party. Turner testified that defendant asked her to take them back to Orchard Road "to talk to their brother." The jury reasonably could have inferred that defendant meant his group intended to speak to Nash.

¶ 155    Turner drove defendant, Allen, Herbert, and Walls back to the party on Orchard Road. There was evidence that defendant asked Turner not to drive away from the area. Additionally, according to Turner, when she then turned her car around, Herbert returned to her car at a "skipping speed" and got in the front passenger seat. This was in contrast to the first time the group arrived on Orchard Road that day, when they let their respective drivers leave the area immediately after dropping them off. The jury reasonably could have concluded that defendant and his friends wanted Turner to stay because they knew they would need to make a quick exit from the scene.

¶ 156    There was evidence indicating that both Allen and defendant spoke with Nash in the brief period the group was on Orchard Road for the second time. After shots rang out, Herbert prevented Turner from driving away from the scene until defendant, Allen, and Walls got back in the car. Turner drove the four men to the hospital, where they hurriedly dropped Allen off before driving to an apartment building on Hillview Drive. A reasonable inference from this evidence is that defendant, Herbert, and Walls left the hospital quickly because they did not want to talk to the police and/or they needed to hide guns.

¶ 157 Police officers were soon dispatched to Hillview Drive for a report of somebody banging on apartment doors and talking about guns. When police officers arrived, Walls was gone, and the officers did not find any guns on either defendant or Herbert. A reasonable inference is that either Walls took the guns or that defendant and Herbert managed to hide the guns before encountering the police.

¶ 158 When defendant interacted with police officers at the apartment building on Hillview Drive, he lied to them by saying he had arrived in an Uber. When defendant was questioned by the police the next day, he lied to them about his activities on the day of the shooting until he was presented with photographs contradicting his story. The jury reasonably could have viewed defendant's lying as consciousness of guilt. *Walker*, 2020 IL App (4th) 180774, ¶ 93.

¶ 159 The circumstances collectively made it reasonable for a trier of fact to conclude that defendant participated in planning Nash's shooting and arranged a getaway car. To be sure, the evidence was not overwhelming. There was conflicting evidence presented at trial, particularly through witnesses who contradicted their own statements to the police. However, the jury was aware of these contradictions, and "it was for the jury, as the trier of fact, to assess the credibility of all the witnesses." *Salazar*, 2014 IL App (2d) 130047, ¶ 56. The jury reasonably could have credited the various witnesses' contemporaneous statements to the police over their contradictory trial testimony. The State's evidence was sufficient to support defendant's conviction for first degree murder under a shared criminal intent theory of accountability.

¶ 160                                III. CONCLUSION

¶ 161 For the reasons stated, we affirm the trial court's judgment.

¶ 162 Affirmed.